LAKES REGION LEGAL DEFENSE
FUND, INC., Plaintiff,

v.

Rodney SLATER, as Secretary of Department of Transportation; Robert L. Lee, as Division Administrator, Federal Highway Administration; Darrel Rensink, as Director of the Iowa Department of Transportation; and Harry S. Budd, as Director of Project Planning, Iowa Department of Transportation, Defendants,

Highway 71 Utilities Board,
Intervenor/Defendant.

No. C 97–4077–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Nov. 24, 1997.

Wallace Taylor, Cedar Rapids, IA, Robert Goodwin of Goodwin Law Office, P.C., Ames, IA, for Plaintiff Lake Region Legal Defense Fund, Inc.

David Ferree, Kerry Anderson, Sp. Asst. Attys. Gen., Iowa Dept. of Transp., Ames, IA, for State Defendants Darrel Resink, Harry Budd.

Willis Buell, Asst. U.S. Atty., Souix City, IA, Helen Mountford, Regional Counsel for U.S. Dept. of Transp., Fed. Highway Admin., for Federal Defendants Rodney Slater, Robert Lee.

Ivan Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, IA, for Intervenor, Highway 71 Utilities Bd.

## MEMORANDUM OPINION AND ORDER ON TRIAL ON THE MERITS

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................1175
 A. Background ...............................................1175
 1. The parties ...........................................1175
 2. Procedural history ...................................1176
 3. The LRLDF's claims ................................1177
 B. Statutory Framework....................................1178
 1. NEPA ................................................1178
 2. Section 4(f) ..........................................1180

C. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1181
 1. The Highway 71 project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1182
 2. The environmental assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1183
 3. The preliminary section 4(f) statement. . . . . . . . . . . . . . . . . . . . . . . . . . .1184
 4. The 1993 addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1184
 5. The FONSI and final 4(f) statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1185
 a. FONSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1185
 b. Final 4(f) statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1186
 6. "Changed conditions" and "cumulative impacts". . . . . . . . . . . . . . . . . . .1186

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1187
A. NEPA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1187
 1. Has NEPA been triggered? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1188
 2. Was the FONSI arbitrary and capricious? . . . . . . . . . . . . . . . . . . . . . . . .1189
 a. The appropriate standard of review . . . . . . . . . . . . . . . . . . . . . . . . . .1189
 b. Application of the appropriate standard of review. . . . . . . . . . . . . . . .1193
 3. Changed conditions and cumulative impacts . . . . . . . . . . . . . . . . . . . . . .1196
 a. Impacts identified since the FONSI . . . . . . . . . . . . . . . . . . . . . . . . . .1196
 b. Cumulative impacts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1197
 c. Maywood Bypass. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1197
 4. Public involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1198
B. Section 4(f) Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1199
 1. Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1199
 2. The Overton Park inquiry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1200
 3. Application of the Overton Park inquiry . . . . . . . . . . . . . . . . . . . . . . . . . .1200
 a. Claire Wilson Park . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1202
 b. The Okoboji bridge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1203
 c. The Wharf restaurant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1205

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1205

Competing interests collide in this action pursuant to the National Environmental Policy Act of 1969,[1] commonly called "NEPA," and the federal Department of Transportation Act.[2] On the one hand is the interest in preserving the character and environment of Iowa's Great Lakes Region and the "Okoboji lifestyle."[3] On the other is the interest in

1. 42 U.S.C. § 4321 *et seq.*

2. 49 U.S.C. § 301 *et seq.*

3. The Iowa Great Lakes Region has been described as Iowa's "shangri-la." Indeed, this resort area has become so popular that it commands a number of sites on the Internet. For example, using the search engine AltaVista and the term "Lake Okoboji," the court located 266 home pages. Using the term "Iowa Great Lakes," the court found 249 home pages. One of the Okoboji web pages contains the following description of the lakes:

Known throughout Northwest Iowa as Iowa's Great Lakes, these amazing natural treasures are a center for family fun, peaceful relaxation and exciting summer celebration.

*Iowa Great Lakes–Okoboji* (visited November 24, 1997) <http://elwood.pionet.net/nwiowa/okoboji/$. The ambiance of the region is captured in the fictional "University of Okoboji's" motto— "where fun in life is your degree." *See University of Okoboji*, (last modified August 4, 1996) <http:// www@okoboji.com/u-of-o/$. Herman Richter, Director of Student Affairs, describes the University of Okoboji as "[a]n attitude. If Walter

Mitty were alive today, that's where he'd be going to school. Believing in the University of Okoboji has become a bit like believing in Santa Clause." *Id.*

Another Okoboji web page sets forth a brief history of the Iowa Great Lakes Region, courtesy of "resident historian" R. Aubrey LaFoy. *Okoboji* (visited November 24, 1997) <http://www.okoboji.com/welcome/history/$. LaFoy observes that the Iowa Great Lakes Region is comprised of twenty-three lakes, and is located in Dickinson County, Iowa. Dickinson County is situated in the northwest portion of the state. The watershed for the Iowa Great Lakes Region stretches north from Iowa into Minnesota, and encompasses approximately 85,000 acres.

The Lewis and Clark Expedition of 1804 described the Iowa Great Lakes Region as "Lac D'Espirit or Spirit Lake." Spirit Lake is the "largest natural body of water" in Iowa. LaFoy notes that Spirit Lake's name stems from a legend that the lake was at one time inhabited by spirits. Spirit Lake, East Lake Okoboji, West Lake Okoboji, Upper Gar Lake, Minnewashita Lake, and Lower Gar Lake comprise what LaFoy refers to as the "connected chain of lakes," because they are linked by spillways.

improving highway safety and access through this popular resort area. As media attention to this case demonstrates, it is no secret that many Iowans have strong feelings about the Highway 71 project through the Iowa Great Lakes Region. There seems to be no shortage of opinions for and against the project among the state's citizenry, let alone among the numerous witnesses who testified in this trial.

At the outset, however, the court must point out that its job is *not* to weigh these competing interests. Indeed, pursuant to the applicable statutes dictating the standards for judicial review, this case is not about whether the Highway 71 project is necessary, a good or a bad thing for the region, or the "right" way to do it if some change is required. The court may not exercise its judgment "for" or "against" the project. The court is not allowed to make a judgment about whether the project is "good" or "bad," nor even whether there is a better way to go about it. Simply put, the court does not sit as a "super legislator" or as a "super highway engineer" entitled to second guess and revise the judgments of the Iowa Department of Transportation (Iowa DOT) or of the Federal Highway Administration (FHWA) officials—much as the court may be tempted to do so. Rather, by mandate of federal law, the court's role and the scope of its inquiry is much narrower and more constrained. At bottom, the court must decide whether the decision of the Iowa DOT and the FHWA to conduct only a comparatively limited environmental assessment (EA) rather than a more comprehensive environmental impact statement (EIS), and their further decision that the Highway 71 project has no significant environmental impact, are arbitrary and capricious.

## I. INTRODUCTION

### A. Background

The plaintiff, Lakes Region Legal Defense Fund ("LRLDF"), challenges the defendants' decision to widen and improve an approxi-

mate six mile stretch of U.S. Highway 71 in the Great Lakes Region of northern Iowa. Although the plaintiff agrees that certain highway repairs are necessary, it complains that the defendants have failed, under the requirements of NEPA, to prepare an adequate environmental assessment (EA) for the Highway 71 project. The plaintiff contends that the inadequate EA has resulted in an improper "finding of no significant impact" (FONSI) on the environment. The plaintiff maintains that contrary to the recommendation of the EA, a more comprehensive environmental impact statement (EIS) should be prepared before the project is allowed to continue. The plaintiff further complains that the defendants have violated section 4(f) of the Department of Transportation Act by failing to make a "special effort" to preserve public park and historic sites impacted by this highway improvement project. The defendants deny these allegations. As an initial matter, the defendants contend that insofar as no federal funds have been procured for the Highway 71 project, the procedural requirements of NEPA have not been triggered. They further maintain that even if NEPA does apply to the Highway 71 project, the agency's FONSI determination was not arbitrary and capricious. As to the section 4(f) allegations, the defendants assert that they have fully complied with the statutory requirements and have properly determined that there are no feasible and prudent alternatives to using these sites.

The court will begin with an introduction of the parties involved, a review of the relevant procedural history, and a recitation of the LRLDF's contentions. Next, the court will discuss the statutory frameworks applicable to the LRLDF's claims. The court will then set forth the factual background as established by the testimony and documentary evidence presented. Finally, the court will turn to its legal analysis and resolution of the LRLDF's claims.

### 1. The parties

Plaintiff LRLDF is a nonprofit Iowa corporation, organized to advocate for "govern-

As for the curious name "Okoboji," LaFoy states that "[n]o one knows what the word 'Okoboji' means or where it came from although some think it is a Dakota Indian word." West

Okoboji Lake is particularly significant because it is a "blue water lake" comparable to Lake Geneva in Switzerland and Lake Louise in Canada. *Id.*

mental policies and decisions which will preserve the unique features of the Iowa Great Lakes Region." Pl.'s Amended and Substituted Complaint for Declaratory and Injunctive Relief, ¶ 8. Some of LRLDF's members are seasonal residents of the Iowa Great Lakes Region. Others reside there year-round. LRLDF claims that several of its members face immediate harm from the proposed Highway 71 project in that their homes will be displaced by the project and that some of their businesses, located adjacent to the current highway, will be destroyed or seriously affected.

There are two sets of defendants. The federal defendants are the Secretary of the United States Department of Transportation and the Division Administrator of the Federal Highway Administration. Under NEPA, the federal defendants are charged with the responsibility of ensuring that an adequate environmental assessment (EA) is prepared prior to the commencement of a federally funded highway project. The federal defendants delegated the responsibility of preparing the EA to the state defendants in this case.[4] The state defendants are the Director of the Iowa Department of Transportation and the Director of Project Planning, Iowa Department of Transportation.

The intervenor/defendant is the Highway 71 Utilities Board ("Utilities Board"). The Utilities Board is an entity created pursuant to the provisions of Iowa Code Chapter 28E. Its members are the City of Arnolds Park, Iowa, the City of Okoboji, Iowa, the Iowa Great Lakes Sanitary District, and the Iowa Department of Transportation. The Utilities Board was organized for the purpose of designing a master plan for the underground utilities necessary for the Highway 71 project. It has assumed responsibility for the relocation of utility services along certain portions of the proposed route.

### 2. Procedural history

During the three months that this case has been on the federal docket, it has followed a swift and somewhat unique procedural course.

The LRLDF filed its initial complaint on August 27, 1997, seeking declaratory and injunctive relief against the federal defendants, Rodney Slater, Secretary of the Department of Transportation, and Robert L. Lee, Division Administrator of the Federal Highway Administration. LRLDF amended its complaint on September 9, 1997, for the purpose of adding the state defendants, Darrel Rensink, Director of the Iowa Department of Transportation, and Harry S. Budd, Director of Project Planning, Iowa Department of Transportation.

On September 9, 1997, LRLDF filed a Motion for Preliminary Injunction seeking to enjoin the federal and state defendants from undertaking any activity which would adversely impact the cultural, historical, and environmental features it seeks to protect. Approximately two weeks later, on September 25, 1997, LRLDF moved the court to issue a temporary restraining order ("TRO") to prevent the federal and state defendants from destroying or otherwise damaging The Wharf restaurant building in Okoboji, Iowa.[5] After an abbreviated and expedited evidentiary hearing, the court granted the TRO on October 3, 1997. It remains in effect as a permanent injunction.

During the TRO hearing, the parties advised the court that a parallel state action for injunctive relief was pending in the Iowa District Court for Dickinson County. The parties further advised that all of the evidence in the state court proceeding would apply to the federal court proceeding. A

---

**4.** Such delegation is countenanced by the regulations implementing the NEPA. Specifically, Title 23, § 771.119 of the Code of Federal Regulations provides, in pertinent part, that

 **Environmental assessments.**
 (a) An EA shall be prepared by the applicant in consultation with the Administration ...
23 C.F.R. § 771.119(a) (1997). The "applicant" here is the Iowa Department of Transportation.

**5.** Ordinarily, a TRO is sought prior to, or concurrently with, a motion for preliminary injunction. Apparently at the time the LRLDF filed its preliminary injunction motion, it believed no contracts would be let on the project nor would any construction be undertaken until sometime early in 1998. The LRLDF then learned that plans were underway to remove or otherwise alter The Wharf restaurant building as early as October 1997.

preliminary injunction hearing had already been scheduled in the state matter for October 16, 1997. Mindful of the longstanding relationship of cooperation and mutual respect enjoyed by Iowa state courts and federal district courts sitting in Iowa, this court offered to combine the federal and state proceedings to minimize the time and expense of the parties.

On October 16th and 17th, 1997, a joint preliminary injunction hearing was held by this court and the Iowa District Court for Dickinson County in the Dickinson County Courthouse, Spirit Lake, Iowa. The Honorable Joseph J. Straub presided over the state action. Plaintiff LRLDF was represented by counsel Wallace Taylor, Cedar Rapids, Iowa, and Robert Goodwin of Goodwin Law Office, P.C., Ames, Iowa. State defendants Darrel Rensink and Harry Budd appeared through their counsel, David Ferree and Kerry Anderson, Special Assistants Attorney General, Iowa Department of Transportation, Ames, Iowa. Federal defendants Rodney Slater and Robert Lee were represented by counsel Willis Buell, Assistant United States Attorney, Sioux City, Iowa, and Helen Mountford [6], Regional Counsel for the United States Department of Transportation, Federal Highway Administration. Intervenor [7] Utilities Board appeared through its counsel, Ivan Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, Iowa.

During the second day of the preliminary injunction hearing, it became apparent that the magnitude of testimony and documentary evidence presented in the federal matter would require a continuance of the hearing. Observing that the testimony and evidence offered had exceeded the scope of the preliminary injunction motion, the court advised the parties of its willingness to consolidate the preliminary injunction proceeding with a trial on the merits.[8] All parties agreed to proceed in this manner, and additional testimony and evidence, as well as oral arguments, were presented on October 29, 1997, in the Federal Courthouse in Sioux City, Iowa.

### 3. The LRLDF's claims

As indicated above, the LRLDF asserts claims pursuant to the National Environmental Policy Act and the Department of Transportation Act. In the flurry of briefs prepared for the TRO hearing, the preliminary injunction hearing, and the consolidated trial on the merits, the LRLDF has advanced a litany of arguments. The court understands the essence of the LRLDF's claims to be as follows.

The LRLDF contends that the defendants' finding that the Highway 71 project will have no significant impact on the environment (FONSI), and thus that an environmental impact statement (EIS) is unnecessary, is arbitrary and capricious. The gravamen of this complaint is four-fold. First, the LRLDF asserts that the defendants' FONSI is based on inadequate and incorrect information contained in the EA and its Adden-

---

6. Although Ms. Mountford was present during all of the hearings held on this matter, she did not formally appear on behalf of the Federal Highway Administration because she failed to file a motion for Pro Hac Vice Admission as required by Local Rule 83.2(d)(2) of the Local Rules for the Northern District of Iowa.

7. The Utilities Board filed its Motion to Intervene as a defendant on October 15, 1997. In its motion, the Utilities Board indicated that if the LRLDF was successful in its quest for injunctive relief, the Utilities Board would be required to redesign the utility locations and the plans for relocation of the affected utilities. The Utilities Board further indicated that "the integrity of engineering service contracts for the relocation of the utilities which have already been awarded in the sum of $1,000,000.00 and the contract for reconstruction which has been awarded in the

sum of $4,900,000.00" were jeopardized by the LRLDF's lawsuit. Despite the exceptionally short notice to the court and to the parties, the Utilities Board was conditionally allowed to participate in the preliminary injunction hearing. None of the parties resisted the Motion to Intervene, and the court granted the motion on October 25, 1997.

8. Such a procedure is authorized by Rule 65(a) of the Federal Rules of Civil Procedure. Rule 65(a) provides, in pertinent part, that:

*Consolidation of Hearing With Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

FED. R. CIV. P. 65(a).

dum. Second, the LRLDF contends that the defendants have essentially ignored the impact "changed conditions"[9], arising after the issuance of the 1993 FONSI, will have on various residences and businesses, a number of mature trees, wetlands,[10] water-quality in East and West Okoboji Lakes, and almost thirty acres of agricultural land. Third, the LRLDF asserts that the EA, its Addendum, and the FONSI patently fail to address the "cumulative impacts"[11] the improvement project will have on the Iowa Great Lakes Region environment. Finally, the LRLDF contends that the defendants have flouted NEPA's procedural fairness requirements by failing to create a "fully-informed public" regarding the various project alternatives and their respective impacts.

In addition to its NEPA claims, the LRLDF asserts that the defendants have violated section 4(f) of the Department of Transportation Act. The LRLDF contends that the defendants have failed to demonstrate that there is no feasible alternative to destroying the Okoboji Bridge and The Wharf restaurant[12]. Further, the LRLDF maintains that the defendants have not "shown any effort to find feasible alternatives to taking a portion of Claire Wilson Park."

As relief for its section 4(f) claims, the LRLDF seeks a permanent injunction preventing the defendants from destroying the Okoboji bridge and from encroaching upon Claire Wilson Park. As for its NEPA claims, the LRLDF seeks an injunction halting construction on the Highway 71 improvement project until an environmental impact statement (EIS) is prepared, considering alterna-

tives and comparing their respective adverse impacts on the human environment in the Iowa Great Lakes Region. At a minimum, the LRLDF requests that this court reject the FONSI prepared by the defendants, and remand this matter to the agency[13] so that a supplemental EA may be prepared.

### B. Statutory Framework

The LRLDF's claims revolve largely around the adequacy of a number of environmental documents prepared by the defendants in the course of the Highway 71 improvement project. To give these claims as well as the pertinent documents some context, a discussion of the applicable statutory frameworks is warranted.

### 1. NEPA

The National Environmental Policy Act ("NEPA") "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989) (citing section 101 of NEPA, 42 U.S.C. § 4331). NEPA has "twin aims." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). First, it "ensures that the agency takes a 'hard look' at the environmental consequences of its proposed action...." *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1286 (1st Cir.1996) *cert. denied*, —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997) (citing *Robertson*, 490 U.S. at 350, 356, 109 S.Ct. at 1845, 1849)). Second, it "ensures that the agency will inform the public that it

**9.** These "changed conditions" are set forth in section 6 of the Factual Background, *infra*.

**10.** In what appears to be an abundance of caution, the state defendants have resisted what they identify as the LRLDF's "Clean Water Act Claim, 33 U.S.C. § 1251(a)." State Defendants' Trial Brief at 10–12. The court finds no such claim in the LRLDF's Amended and Substituted Complaint, and will not address such a claim in this opinion. To the extent that the LRLDF has complained about the defendants' treatment of water quality issues as well as issues regarding the wetland areas allegedly impacted by the Highway 71 project, the court will consider those claims in its analysis of the adequacy of the FONSI.

**11.** The "cumulative impacts" are set forth in section 6 of the Factual Background, *infra*.

**12.** The LRLDF considers both of these sites to be of historical significance to the Iowa Great Lakes Region.

**13.**· As counsel for the federal defendants acknowledged during oral arguments, the federal agency is ultimately responsible for ensuring that the procedural requirements of NEPA are followed. Here, the state agency prepared and presented the pertinent environmental documents, but the federal agency "is the one that ultimately made the call."

has indeed considered environmental concerns in its decision-making process." *Baltimore Gas,* 462 U.S. at 97, 103 S.Ct. at 2252 (citing *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project,* 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981). However, NEPA is process oriented, not result oriented:

> NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action. . . .

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1857, 104 L.Ed.2d 377 (1989) (citing 42 U.S.C. § 4321); *Robertson,* 490 U.S. at 350, 109 S.Ct. at 1846 ("Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."); *Sierra Club v. United States Forest Serv.,* 46 F.3d 835, 837 n. 2 (8th Cir.1995) ("The purpose of NEPA is to ensure that government agencies act on full information and that interested groups have access to such information. NEPA thus imposes procedural requirements, but not substantive results on agencies"; citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989), and *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). What NEPA establishes is "important action-forcing' procedures." *Robertson,* 490 U.S. at 348, 109 S.Ct. at 1844 (quoting 115 CONG. REC. 40416 (remarks of Sen. Jackson), and also citing S. REP. No. 91–296, p. 19 (1969), 1969 U.S.C.C.A.N. 2751; *Andrus v. Sierra Club,* 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979); and *Kleppe v. Sierra Club,* 427 U.S. 390, 409 & n. 18, 96 S.Ct. 2718, 2729 & n. 18, 49 L.Ed.2d 576 (1976)).

More specifically, "NEPA is a procedural statute that requires federal agencies to gather and disseminate certain information before taking any actions that may affect the environment." *Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1171 (8th Cir.1994). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson,* 490 U.S. at 349, 109 S.Ct. at 1845; *Marsh,* 490 U.S. at 371, 109 S.Ct. at 1858 ("By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."). NEPA's requirements that the information gathered be disseminated "permits the public and other governmental agencies to react to the effects of a proposed action at a meaningful time." *Marsh,* 490 U.S. at 371, 109 S.Ct. at 1858. However, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson,* 490 U.S. at 351, 109 S.Ct. at 1846. To put it another way, "NEPA merely prohibits uninformed-rather than unwise-agency action." *Id.*

In *Sierra Club,* the Eighth Circuit Court of Appeals described the process under NEPA whereby federal governmental agencies obtain the "full information" upon which they are to act:

> [NEPA] requires an [Environmental Impact Statement (EIS) ] be prepared for all "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(2)(C). If these activities were not adequately analyzed in the [agency's] Plan EIS, and they constitute a "major Federal action," a project level EIS may be necessary in addition to the [agency's] Plan EIS. *See, e.g., Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994). If an activity is contemplated that does not automatically require an EIS, an Environmental Assessment (EA) may be conducted to determine whether a project level EIS is necessary. 40 C.F.R. § 1501.3–

1501.4. An EA analyzes and compares several alternative courses of action, including doing nothing, the "No Action" alternative. 40 C.F.R. § 1508.9(2)(b). The purpose of the document is to assist in determining whether any of the proposed actions will significantly affect the environment. 40 C.F.R. § 1508.9(a)(1).

*Sierra Club,* 46 F.3d at 837; *Neighborhood Transp. Network, Inc.,* 42 F.3d at 1171 (outlining the same procedures). Federal regulations pursuant to NEPA "specify what kinds of federal actions clearly require an EIS and which clearly do not." *Neighborhood Transp. Network, Inc.,* 42 F.3d at 1171 (citing 40 C.F.R. § 1500 *et seq.*). However, "[f]or federal actions that are not in either category, an agency must prepare an environmental assessment ("EA") to determine whether an EIS is required." *Id.* (citing 42 U.S.C. § 4332(2)(E)). An EA is supposed to be "a concise public document." 40 C.F.R. § 1508.9(a); *Sierra Club,* 46 F.3d at 840. It is supposed to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1); *Sierra Club,* 46 F.3d at 840.

If the EA results in a finding of no significant impact (FONSI), no EIS is required for the project, and the project may proceed. *Sierra Club,* 46 F.3d at 837–38; *Neighborhood Transp. Network, Inc.,* 42 F.3d at 1171. A FONSI "means a document by a Federal agency briefly presenting the reasons why an action ... will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13; *Sierra Club,* 46 F.3d at 837 n. 4 (quoting the regulation).

### 2. Section 4(f)

The LRLDF's second federal claim is brought pursuant to what is commonly referred to as "Section 4(f)" of the federal Department of Transportation Act. *See* 49 U.S.C. § 303(c) (formerly 49 U.S.C. § 1653(f)). The provision in question, § 4(f)of Pub.L. 89–670, 80 Stat. 934, was enacted on October 15, 1966, and was originally codified at 49 U.S.C. § 1653(f), but has since been amended and recodified at 49 U.S.C. § 303(c). In brief, section 4(f) requires that, "[b]efore the Secretary of Transportation can approve the use of publicly owned parkland or any land of historic significance, [he or] she must find that there is no feasible or prudent alternative to such use, and that all planning has been done to minimize the harm to such property." *Ringsred v. Dole,* 828 F.2d 1300, 1302 (8th Cir.1987).[14] *Accord Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 405, 91 S.Ct. 814, 817, 28 L.Ed.2d 136 (1971) (Section 4(f) "prohibit[s] the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a 'feasible and prudent' alternative route exists. If no such route is available, the statutes allow him [or her] to approve construction through parks only if there has been 'all possible planning to minimize harm' to the park."); *Alaska Ctr. for the Env't v. Armbrister,* 123 F.3d 1298, 1300 (9th Cir.1997) ("Section 4(f) prohibits 'the use of publicly owned land of a public park [or] recreation area' unless the FHWA determines 'there is no prudent and feasible alternative to using that land ....,'" quoting 49 U.S.C. § 303(c), and also citing *Citizens to Preserve Overton Park,* 401 U.S. at 405, 91 S.Ct. at 817); *Sierra Club v. Slater,* 120 F.3d 623, 634 (6th Cir.1997) (citing the statutory language); *Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 530 (9th

**14.** The text of Section 4(f), in its entirety, is as follows:

(c) The Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

(1) there is no prudent and feasible alternative to using the land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

Cir.1994) (citing the statutory language). "[T]he intent of Congress in enacting section 4(f) was to ensure that the protection of parkland was given prime importance in considering where to build federal roads and highways." *Id.* at 1303 (citing *Citizens to Preserve Overton Park,* 401 U.S. at 412–13, 91 S.Ct. at 821–22). Indeed, the language of section 4(f) "is a plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted." *Citizens to Preserve Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821.

■ In appropriate circumstances, federal authorities must prepare what is commonly known as a "Section 4(f) Statement" to show that the Secretary of Transportation has determined that there is no feasible and prudent alternative to the use of the parkland and that the harm to the property would be minimized. *See* 49 U.S.C. § 303(c) (formerly 49 U.S.C. § 1653(f)); 23 U.S.C. § 138; *Ringsred,* 828 F.2d at 1301. "Section 4(f) property," which requires the preparation of a statement when it is encroached upon by a highway project, is a "public park, recreation area, or wildlife and waterfowl refuge or national, State, or local significance, . . . or any land from an historic site of national, State, or local significance." 23 U.S.C. § 138; *Sierra Club,* 120 F.3d at 633. When "parkland" is at issue, "[s]ection 4(f) is applicable only if the affected land is publicly owned and designated or administered as a public park, recreation area, or wildlife and waterfowl refuge." *Ringsred,* 828 F.2d at 1304 (citing *National Wildlife Fed'n v. Coleman,* 529 F.2d 359, 369–71 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976)). Where a complainant proves only that the land is publicly owned, but fails to prove that it meets any of the other prerequisites for section 4(f) treatment, the Secretary has not erred in failing to consider the land to be "section 4(f) property." *Id.*

■ "Section 4(f) property" also includes "historic sites":

Section 4(f) by its own terms protects historic sites of local, state or national significance. In order to invoke the protections of 4(f), an historic site must meet the criteria of eligibility for inclusion in the National Register of Historic Places. 23 C.F.R. § 771.135(d) [now 23 C.F.R. § 771.135(e) ]. Historic sites or structures eligible for inclusion in the National Register are subject to 4(f) protection only when they will be [ ] used in the construction of the freeway project. 49 U.S.C. § 1653(f) (1976) [ (now 49 U.S.C. § 303(c)) ].

*Arizona Past & Future Found., Inc. v. Lewis,* 722 F.2d 1423, 1429 (9th Cir.1983). Thus, the historic site in question must at least be eligible for inclusion in the National Register before it is "section 4(f) property." *Id. Accord Citizen Advocates for Responsible Expansion v. Dole,* 770 F.2d 423, 438 (5th Cir. 1985) ("Under section 4(f), property determined to be eligible for inclusion on the National Register of Historic Places is afforded the same protection as those properties already on the roll."); *Benton Franklin Riverfront Trailway & Bridge Comm. v. Lewis,* 701 F.2d 784, 786 (9th Cir.1983) ("Properties determined eligible are 'on an equal footing with property that is actually listed' in the National Register" for section 4(f) purposes). A federal regulation defines the procedure to determine whether a site is eligible for inclusion in the National Register for section 4(f) purposes:

(e) In determining the application of section 4(f) to historic sites, the Administration, in cooperation with the applicant, will consult with the State Historic Preservation Officer (SHPO) and appropriate local officials to identify all properties on or eligible for the National Register of Historic Places (National Register). The section 4(f) requirements apply only to sites on or eligible for the National Register unless the Administration determines that the application of section 4(f) is otherwise appropriate.

23 C.F.R. § 771.135(e).

With these statutory frameworks in mind, the court turns to a recitation of the relevant factual background.

### C. Factual Background

The federal and state defendants have sub-

mitted a voluminous administrative record[15] which they contend supports the EA, its Addendum, and the FONSI they issued regarding the Highway 71 project. The propriety of the defendants' reliance on the administrative record is a matter to be resolved in the Legal Analysis section of this opinion. Here, the court will review the factual background as it has been established by the environmental documents themselves, other portions of the administrative record, and explanatory testamentary evidence.[16]

### 1. The Highway 71 project [17]

U.S. Highway 71 ("U.S.71") is presently a two-lane highway extending north through the Iowa Great Lakes Region cities of Milford, Arnolds Park[18], Okoboji, and West Okoboji, where it meets Iowa Highway 9 in Spirit Lake, Iowa. Often described in this litigation as the "Highway 71 Corridor," U.S. 71 passes alongside Lower Gar Lake, Lake Minnewashta, and Center Lake, and stretches across the narrow isthmus separating West Okoboji Lake from East Okoboji Lake.

Plans to improve U.S. 71 through the Iowa Great Lakes Region began nearly thirty years ago. The original improvement concept envisioned a four-lane improvement, separated by a raised median that was to be developed into a left turn-lane in the cities of Arnolds Park and Okoboji. Various delays

---

**15.** Actually, the defendants have submitted two administrative records. The first "record," in four volumes, was submitted to the court on October 16, 1997. The defendants submitted a supplemental three volume "record" on October 29th.

**16.** The Eighth Circuit Court of Appeals has observed that a district court considering a voluminous administrative record in the context of a NEPA claim may allow "testimony of an explanatory nature." *Missouri Coalition for the Env't v. Corps of Eng'rs,* 866 F.2d 1025 (8th Cir.1989), *cert. denied,* 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989) (citing *Sierra Club v. United States Army Corps of Eng'rs,* 771 F.2d 409, 413 (8th Cir.1985). In this case, numerous witnesses testified on behalf of the federal and state defendants for the purposes of explaining not only the Highway 71 project, but also the voluminous administrative record and the procedures used to compile it.

Subject to a standing objection lodged by the federal and state defendants, as well as the intervenor, the court also heard testimony from various members and other supporters of the LRLDF. The LRLDF also offered documentary evidence which the court took subject to the defendants' objections. At the outset, the court observes that this testimony and accompanying evidence was helpful to the court insofar as it clarified the LRLDF's claims. The LRLDF cites the Second Circuit Court of Appeals' decision in *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368,1384-85 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), for the proposition that the district court may consider such "extra-record" evidence when considering a challenge to the federal agency's compliance with NEPA. The court is mindful that some circuits have indeed endorsed the use of "extra record" evidence in NEPA cases. *See generally* Susannah T. French, *Judicial Review of the Administrative Record in NEPA Litigation,* 81 Calif. L. Rev. 929 (1993). However, the court finds that the Eighth Circuit Court of Appeals has not embraced such an expansive view, and instead limits the district court's consideration of the administrative record and accompanying "explanatory testimony." *See Missouri Coalition for the Env't,* 866 F.2d at 1031. As a practical matter, for reasons discussed infra, even if the Eighth Circuit Court of Appeals were to adopt the more expansive standard urged by the LRLDF, it would not affect the outcome here.

**17.** The Highway 71 project is technically identified as Project No. F-71-9.

**18.** Arnolds Park was homesteaded by W.B. Arnold in the 1860's. *The Arnolds Park Adventure* (visited November 24, 1997) < http://www.arnoldspark.com/history/$. An Arnolds Park home page offers the following account of the area's development:

> [W.B. Arnold] built a boarding house for the occasional hunting and fishing parties that ventured there on the primitive roads. At that time, a boat house was the only way to reach many of the areas that are populated today. In 1883, the trains arrived and opened the lakes to the first "tourists" and the popularity of the Iowa Great Lakes exploded. [W.B.] Arnold expanded his facility by adding a full fledged Arnolds Park Hotel.
>
> * * * * * *
>
> Arnold added the first "amusement" park to his property around the 1890's ... [i]t was the start of more than 100 years of fun and entertainment at Arnolds Park Amusement Park.
>
> * * * * * *
>
> [Future designs for the amusement park] include a resort, providing a complete vacation spot for visitors of all ages. The charm that has become the trademark of one of the oldest amusement parks in the midwest will once again be a part of generations to come.

*Id.*

plagued the project, and the original concept was revised numerous times. In 1976, the city of Okoboji filed suit in federal court to halt further development and construction of the project because of alleged economic hardships and ecological concerns. The Iowa Department of Transportation ("Iowa DOT") voluntarily ceased work on the project at that time. In 1977, the Iowa DOT was formally enjoined [19] from undertaking further activity on the project. The injunction was modified to allow the Iowa DOT to continue with the planning, design, application for permits and approval from other agencies, public hearings, and completion of all environmental studies. The State remained enjoined, however, from acquiring any right-of-way and from actual construction.[20]

Continuing legal delays and rising construction costs haunted the project until it was deferred indefinitely in 1980. In 1987, planning studies for the lakes area highway improvement resumed. The Iowa DOT Commission subsequently authorized location/environmental studies for the project.

Although the plans and specifications have changed over time, the Highway 71 project is essentially an effort to widen certain portions of the existing U.S. 71 to ease the traffic congestion that has developed in this popular resort area [21] and to improve roadway safety. Current plans propose that various sections of U.S. 71 be widened to three, four, and five lane segments along the six mile stretch from where U.S. 71 meets Iowa Highway 86 in the south, to where it meets Iowa Highway 9 in the north. A design schema prepared by the Iowa DOT sets forth the various segments as follows: a Rural 4 Lane segment extending north from the city of Milford (Maywood Bypass); an Urban 4 Lane segment narrowing to an Urban 3 Lane segment from the Maywood Bypass to the Okoboji Causeway;

an Urban 3 Lane segment widening to a Rural 5 Lane segment from the Okoboji Causeway north to 175th Street, Okoboji; and a Rural 4 Lane (divided median) changing to an Urban 4 Lane (divided median) from 175th Street north to the U.S. 71 junction with Iowa Highway 9.

Another proposed improvement contemplates replacing the historic two-lane concrete cantilever bridge which extends across the isthmus separating East and West Lake Okoboji with a more modern three-lane bridge.

A four-lane bypass around the Maywood residential area is also part of the project proposal. Currently, U.S. 71 passes directly through Maywood.[22] The "Maywood bypass" contemplates an approximate 1.2 mile diversion from the existing right of way.

Although a sum certain for the Highway 71 project has yet to be calculated, a recent projection estimates the cost of the proposed lane expansions, the new bridge, the Maywood bypass, and other improvements to be approximately twenty million dollars.

### 2. The environmental assessment

The state defendants prepared an EA and a Draft Section 4(f) Statement for the proposed Highway 71 project in 1989. Copies of the EA were submitted by the Iowa DOT to the Federal Highway Administration (FHWA), the United States Department of the Interior, the Environmental Protection Agency, the Army Corps of Engineers, the Iowa Department of Natural Resources, and the Iowa State Historic Preservation Office for comment.

The EA is set forth in a fifty-four page document with an attached forty-six page appendix. It is divided into six primary sections. The first section sets forth a description of the proposed action for the Highway

---

**19.** The injunction was issued by the United States District Court for the Southern District of Iowa, Central Division.

**20.** In early 1991, the Iowa DOT and the Dickinson County Board of Supervisors executed a "County Agreement" which provided, *inter alia*, that the county agreed to voluntarily support lifting the injunction.

**21.** A Pre-location Study of the U.S. 71 Corridor, prepared in May of 1987, indicates that the average summer weekday traffic volumes on U.S. 71 through the cities of Arnolds Park and Okoboji exceeded 13,000 vehicles per day.

**22.** The Maywood residential area is located on the southern tip of West Lake Okoboji.

71 project. Section II is entitled "Need for the Project." It contains a detailed review of the Highway 71 project's evolution and background, as well as a detailed description of the present highway, the highway's sufficiency ratings, traffic estimates, and an accident study conducted on vehicles traveling through the pertinent area of the Iowa Great Lakes Region.

Section III is comprised of proposed improvement alternatives listed as: "Division I—Present Alignment Alternate;" "Division I—Maywood Bypass Alternate'; "Division II—Four–Lane Alternate"; "Division II—Three–Lane Alternate"; and "Division III." Each division discusses the parameters of the proposed alternative and any displacements anticipated by its implementation. Several maps displaying the proposed alternatives are also included in this section.

Section IV is entitled Project Impacts/Proposed Mitigation. It is subdivided into the following categories: water quality impacts; natural areas and endangered species; roadside trees; air quality impacts; traffic noise impacts; parks and recreation areas; socioeconomic impacts; cultural resources; and hazardous waste.

Section V contains a summary of the Iowa Department of Transportation's view of the necessity of the project and its opinion that the requisite construction will not result in "any significant adverse social, economic, or environmental impacts." Section VI sets forth a description of the coordination process and the comments received by the Iowa DOT from the reviewing state and federal agencies. Appendices A and B contain photographs of the U.S. 71 Corridor, as well as a traffic noise analysis.

### 3. The preliminary section 4(f) statement

The Preliminary Section 4(f) Statement prepared by the Iowa DOT is attached as Appendix C to the EA. It is a nineteen-page document, also comprised of six primary sections.

Section I essentially reviews the purposes of the Highway 71 project as set forth in the EA. Section II identifies the section 4(f)

property implicated by the proposed project as the Claire Wilson Park. A description of the park and its recreational uses is also set forth in this section. Sections III and IV discuss the projected impacts of the highway improvement project on Claire Wilson Park. Section V identifies possible measures to "minimize the harm" to the park area. Finally, section VI reviews the coordination process utilized by the Iowa DOT and the Iowa Department of Natural Resources to develop the preliminary 4(f) statement.

### 4. The 1993 addendum

In 1993, a fifteen page addendum was prepared to address proposed improvements, including a revised Maywood Bypass, that were not contained in the 1989 EA. The addendum sets forth anticipated impacts on water quality, natural areas and endangered species, air and noise, and park and recreation areas. It further considers potential socio-economic and cultural impacts, as well as hazardous waste impacts. Proposed mitigation measures to minimize these impacts are also discussed.

Additionally, the addendum contains a supplemental 4(f) statement regarding the Okoboji bridge. The Okoboji bridge was built in 1929. It spans the narrow isthmus between the East and West Okoboji Lakes. The proposed Highway 71 improvement plan calls for the existing structure to be destroyed and replaced by a more modern three-lane bridge.

Although it is not a National Historic Landmark, the Okoboji bridge has been determined to be eligible for listing on the National Register of Historic Places by the Iowa State Historic Preservation Office. The bridge is significant primarily because it is one of the few reinforced concrete cantilevered deck girder structures remaining in Iowa.

Three alternatives to using the Okoboji bridge are set forth in the 4(f) statement. The first alternative is the "Do–Nothing" alternative. According to the 4(f) statement, this alternative was rejected as not feasible and prudent because it would not accomplish the "primary objectives of improving the level of service through the Lakes Area and

creating a safer traveling environment within the project corridor." Similarly, the second alternative, "Build on New Location Without Using the Old Bridge," was rejected as not feasible and prudent because it "would result in extraordinary bridge and approach engineering, construction difficulties, significant environmental concerns, and higher costs." Finally, the third alternative, "Rehabilitation Without Affecting the Historic Integrity of the Bridge," was also rejected as not feasible and prudent because it would require the addition of federal safety features that would dramatically alter the appearance of the bridge and thus destroy "an integral part of its overall historical/aesthetic quality." Additionally, the construction work for this alternative would result in boat traffic between the lakes being blocked for up to one year.

The 4(f) statement indicates that the "FHWA will ensure that fully adequate records are made of the bridge in accordance with the Historic American Engineering Record (HAER)." It also states that for purposes of mitigation, a Memorandum of Agreement [23] will be executed by the FHWA and the Iowa State Historic Preservation Office to ensure that the Okoboji bridge is properly recorded pursuant to the terms of the HAER Survey.[24]

### 5. The FONSI and final 4(f) statement

#### a. FONSI

On December 15, 1993, the FHWA issued a four-page FONSI for the Highway 71 project. The FONSI sets forth a one page description of the planned improvement. It also states that the proposed improvements will require the "acquisition of approximately 48.5 acres of additional right-of-way and the relocation of one vacant commercial structure, two businesses, and six mobile homes." According to the FONSI, only 27.6 acres of the right-of-way to be acquired are classified as "prime farmland." The FONSI further represents that the project will not significantly affect water quality in the Iowa Great Lakes Region, and indicates that "special construction methods and erosion control measures have been proposed to mitigate potential impacts."

As for natural areas, wildlife habitat, and wetlands, the FONSI states that the project will have no effect on these features. The FONSI further indicates that with the exception of the Okoboji bridge, "this project will have 'no effect' on cultural resources." It recites the agency's determination that although alternatives were considered for avoiding, or at least minimizing the impacts to the bridge, "no feasible alternative to [the bridge's] demolition existed and that the appropriate mitigation was to record the structure according to the standards of the Historic American Engineering Record (HAER)."

Finally, the FONSI acknowledges that the proposed Highway 71 project will require acquiring approximately 0.08 acres of the Claire Wilson Park. This impact, according to the FONSI, is to be mitigated by the purchase of "replacement property" and "several other minor mitigative measures." [25]

The FONSI concludes by stating that:

The Federal Highway Administration (FHWA) has determined that this [Highway 71] project will not have any significant impact on the human environment. This finding of no significant impact is based on the attached Environmental Assessment (EA) and Section 4(f) Statement

---

**23.** Title 23, part 800.5(e) addresses the procedure to be used when a project is found to have an adverse effect on an historic property. In this case, the FHWA and the Iowa State Historic Preservation Officer (SHPO) agreed that replacement of the bridge was necessary and that recordation was the appropriate mitigating measure. Accordingly, the FHWA and the Iowa SHPO executed a Memorandum of Agreement, pursuant to 23 C.F.R. § 800.5(e)(4), memorializing their agreement to record and otherwise document the bridge prior to its destruction.

**24.** The documentation necessary to satisfy the HAER standards includes archival-quality photographs of the bridge, photographic reproductions of the original construction drawings for the bridge, and a written narrative "placing the structure in historical and engineering perspective."

**25.** The FONSI goes on to state that "the project, its impacts on the park, and the proposed mitigation have been coordinated with the Iowa Department of Natural Resources, the agency under whose jurisdiction the site belongs."

which has been independently evaluated by the FHWA and determined to adequately and accurately discuss the environmental issues and impacts of the proposed project. It provides sufficient evidence and analysis for determining that an environmental impact statement is not required. Disposition of comments received at the public hearing have been inserted in the EA as an addendum to that document.

FONSI at 3–4.

### b. Final 4(f) statement

A document entitled Section 4(f) Determinations And Final Section 4(f) Evaluation identifies the only "section 4(f) resource" implicated by the Highway 71 project as Claire Wilson Park.[26] As indicated in the preliminary 4(f) statement, the proposed project requires the permanent acquisition of 0.08 acres of this property.

In addition to a detailed description of the park area and the recreational activities it accommodates, the 4(f) statement sets forth the impacts the proposed project will have on the park. A section entitled "Avoidance Alternatives/Other Alternates Considered" delineates the other alternatives considered for the Highway 71 improvements through the causeway area as well as the "Do–Nothing" alternative, and states that these concepts were rejected because they were "either poorly suited to satisfying the need for the project; were disruptive to existing community facilities, including the park; were detrimental to future development; or were not geometrically practicable."

Mitigation action is also discussed in the 4(f) statement. Specifically, the statement indicates that the Iowa DOT will provide replacement land immediately south of, and adjoining Claire Wilson Park on a "square foot for square foot basis for [the land] permanently displaced by the proposed highway improvement." The 4(f) statement notes that the anticipated replacement land is va-

cant, and that the building formerly located there has been removed. Other mitigation and enhancement measures include the construction of a sidewalk on the new bridge to facilitate pedestrian access through the area, the use of temporary and permanent erosion control devices in the area, construction of curbs as well as intake and storm sewers to control surface runoff, and the creation of a curbed entrance to control ingress and egress.

Finally, the final 4(f) statement reviews the coordination process undertaken by the Iowa DOT, the U.S. Department of the Interior, and the Iowa Department of Natural Resources. The statement represents that all three agencies "concur that there are no feasible and prudent alternatives to the proposed action and to the measures to be undertaken to mitigate for the acquisition of a small strip of land from park site."

### 6. "Changed conditions" and "cumulative impacts"

The LRLDF has identified several examples of what it terms "changed conditions" in the Highway 71 project since the time the EA, the Addendum to the EA, the FONSI, and the Final 4(f) Statement were prepared. Two of the changed conditions concern the Highway 71 project's use of settling basins. According to the EA, five settling basins were originally contemplated for the project. Current plans indicate that eight settling basins will be created. The EA also represented that one of the settling basins would be positioned on the east side of U.S. 71, just north of the causeway. Presently, a Kentucky Fried Chicken is located in this area. The project now proposes to locate that settling basin across the highway on the west side of U.S. 71,[27] on property currently occupied by The Wharf restaurant.

Another changed condition involves the drainage of storm sewers. At the time the

---

**26.** Claire Wilson Park is located in the "narrows" area of the Okoboji Lakes, in the north corporate limits of Arnolds Park. It was created by fill material placed into the lake behind a retaining wall. Although an official survey of Claire Wilson Park has never been performed, it is estimated to occupy approximately 1.25 acres.

**27:** According to Michael Schweyen, environmental program coordinator for the FHWA, the settling basin located on the west side of U.S. 71 will empty into East Lake Okoboji.

EA was prepared, project plans indicated that the storm sewers would discharge into East Lake Okoboji. Project plans now reveal that the storm sewer system will empty into West Lake Okoboji.

Other changed conditions concern the displacement of homes and businesses along the proposed improvement route. The Addendum to the EA states that only two businesses and one vacant building would be displaced by the project. Present plans indicate that twelve businesses are now slotted for displacement. Further, the Addendum represented that no residences would be displaced. Seven residences are currently slotted for displacement.

The amount of right-of-way to be acquired for the Highway 71 project also constitutes a changed condition. The original EA did not indicate that the improvements in the cities of Arnolds Park and Okoboji would extend beyond the existing right-of-way of U.S. 71. Present plans do involve an extension beyond the existing right-of-way. Further, the EA Addendum stated that approximately 48.5 acres of right-of-way were to be acquired. Iowa DOT project engineer, James Bump, testified that the project now calls for the acquisition of approximately 92 acres.[28]

The mitigation replacement land for the identified section 4(f) property has also changed since the preparation of the EA. Originally, the replacement land for the land taken from Claire Wilson Park was planned to be the adjacent land, immediately south of the park area.[29] The project now calls for a portion of The Wharf property to be used for section 4(f) mitigation purposes.

The LRLDF contends that all of the impacts it has identified will individually have a significant impact on the environment. This assertion notwithstanding, the LRLDF argues that even if the impacts are not significant when considered individually, when the following impacts are considered in the aggregate, they most certainly rise to the level of a significant impact on the environment:

1. Over 27 acres of prime farmland being taken;

2. Over 380 trees being taken just in Arnolds Park and Okoboji alone. This does not include an unknown number of trees taken for the rest of the project;

3. Some 8.5 acres of wetlands which have been determined just recently even though the delineation process is not complete;

4. A four lane highway segment on a new location [Maywood Bypass]; and

5. Effects on the water quality of the lakes themselves.

Plaintiff's Trial Brief at 13.

The LRLDF complains that the defendants failed to undertake the proper "cumulative impacts" analysis of these impacts in either the EA or its 1989 Addendum.

## II. LEGAL ANALYSIS

### A. NEPA Claims

The LRLDF contends that federal location approval and other prerequisites to the use of federal funds suffice to bring the Highway 71 project within the requirements of NEPA, even if the state defendants have not yet requested federal funds for the project or decided to allocate federal funds to the project. As an initial matter, the state defendants assert essentially a jurisdictional challenge that no NEPA claim arises, because there has been no triggering event to make NEPA applicable to the state highway project at issue. The court will commence its analysis with a consideration of how NEPA requirements are triggered.

---

28. The 92 acre figure is a point of contention among the parties. Michael Schweyen, an engineer for the FHWA, testified that Bump's estimation was "based on poor information," and that current projections estimate the acquisition figure to be approximately 60 acres.

29. Apparently this original replacement land would have impacted property currently occupied by a business known as Fun Time Rentals. Michael Schweyen testified insofar as the project already requires the acquisition of The Wharf, using the Wharf property for mitigation would accomplish section 4(f) goals while avoiding impacts to another business.

### 1. Has NEPA been triggered?

The parties dispute how NEPA requirements are triggered. The LRLDF contends that NEPA is triggered, that is, federal action for NEPA purposes has occurred, when a project such as the one in question here has received location approval from the Federal Highway Administration, citing *Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 16–17 (8th Cir.1973). The LRLDF asserts that *Indian Lookout Alliance* stands for the proposition that, when a state highway agency takes steps to comply with federal regulations that make a project eligible for federal reimbursement, the project becomes a "federal action" for NEPA purposes.

The state defendants counter that NEPA likely has not been triggered in this case, because the state highway department has not applied for federal funding for the project and has not yet decided whether it will make such an application. This argument is founded on a decision of another circuit's court of appeals, which holds that, unless the state is actually receiving or is planning to receive federal funding for a project, preparation and approval of an EIS is not "major federal action" triggering application of NEPA. *See Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1481 (10th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991).[30]

This court notes that there does appear to be a split in the circuits on precisely what triggers NEPA in cases involving state highway projects. *See Save Barton Creek Ass'n v. Federal Highway Admin.,* 950 F.2d 1129, 1134 (5th Cir.1992), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (noting that there is no "litmus test" for what constitutes "major Federal action" triggering applicability of NEPA in a dispute over applicability of NEPA to another highway project); *Village of Los Ranchos de Albuquerque,* 906 F.2d at 1480 (noting the same problem in another case involving a highway project). On one side of the apparent split is the decision of the Eighth Circuit Court of Appeals cited by the LRLDF, *Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 16–17 (8th Cir.1973).

The court finds that *Indian Lookout Alliance* can be read for the proposition, indeed specifically states as its holding that "the requirements of NEPA and related acts applied when the State Highway Department sought location approval for the proposed highway." *Indian Lookout Alliance,* 484 F.2d at 17. On the other side of the question, however, are numerous decisions from other circuit courts of appeals, stating that NEPA is triggered by actual application for, or allocation of, federal funds to a state highway project. *See, e.g., Sierra Club v. Slater,* 120 F.3d 623, 628 (6th Cir.1997) ("Because the [highway] Project required federal funds, it was necessary to comply with the [NEPA]"); *Save Barton Creek Ass'n,* 950 F.2d at 1135 (where no federal funds had been requested or spent, no federal approvals have been given, federal authorities had disavowed any interest in the project, but the state had "tak[en] advantage of the FHWA's early coordination procedure and be[gun] to compile NEPA compliance documentation so as to preserve state eligibility for federal funding," the court reiterated its prior conclusion that 'the possibility of federal funding in the future for a project or group of projects does not make that project or projects "major [F]ederal action' during the planning stages," citing *Atlanta Coalition on the Transp. Crisis, Inc., v. Atlanta Regional Comm'n,* 599 F.2d 1333, 1347 (5th Cir.1979)); *Village of Los Ranchos de Albuquerque,* 906 F.2d at 1481 (unless the state is actually receiving or is planning to receive federal funding for a project, preparation and approval of an EIS is not "major federal action" triggering application of NEPA); *City of Highland Park v. Train,* 519 F.2d 681, 694–95 (7th Cir.1975), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976) (where no federal funds had been applied for

**30.** The state defendants failed to acknowledge, distinguish, or interpret the decision of the Eighth Circuit Court of Appeals in *Indian Lookout Alliance* in their brief in resistance to LRLDF's motion for a preliminary injunction, even though LRLDF had cited it as controlling authority. The court can find no excuse for failure to discuss a decision that is or may be binding precedent. Citation of what appears to be contrary authority from outside of this circuit is not an adequate response.

to construct a state highway, and the record showed nothing more than a possibility that federal funds would be applied for, NEPA was not triggered). *See also United States v. Southern Florida Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir.1994), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995) (federal advice and technical consultation could not require compliance with NEPA for a local water project where only the possibility of federal funding in the future existed, "even when such funding is likely," and only "if and when" other federal activities occurred, including federal involvement in settlement and remedial measures, federal participation in research, monitoring, and administration, or federal forcing of dispute resolution mechanisms, would they be sufficient to "federalize" the project and make it subject to NEPA); *Macht v. Skinner*, 916 F.2d 13, 16 (D.C.Cir.1990) (preliminary federal funding of a "light rail project" to prepare a draft EIS was so small in relation to the ultimate cost of the project that it could not constitute "major federal action" triggering NEPA, where the federal entity had not yet decided whether to assist the state in the final design or construction of the project); *Enos v. Marsh*, 769 F.2d 1363, 1372 (9th Cir.1985) (where a shoreside deep harbor facility was entirely funded by the state and the federal government exercised no control over the planning or development of the state-funded facilities, NEPA was not triggered); *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 328 (9th Cir.1975) (FAA approval of an airport layout plan did not require an EIS, and, by analogy to highway funding cases, where federal funding remained an open option, but no such funding had been applied for or obtained, NEPA was not triggered). This court must necessarily follow *Indian Lookout Alliance* as the law of the circuit, contrary authority of other circuit courts of appeals notwithstanding.

Although the stated holding in *Indian Lookout Alliance* appears to be quite clear, and would require this court to find as a matter of law that NEPA has been triggered here, the import of that decision is somewhat muddied by the fact that more than just site approval had been obtained in that case. In *Indian Lookout Alliance*, the issue was stat-

ed to be the scope and extent of an EIS relating to the construction of highways "intended to be funded in part by federal funds." *Indian Lookout Alliance*, 484 F.2d at 13. Still more specifically, in that case, the state of Iowa had submitted a plan for the construction of highways throughout the state to the Federal Highway Administration (FHWA) "for informational purposes." *Id.* No approval had been sought from the FHWA for the entire system, but Iowa "ha[d] requested federal funding of the northern seven-mile segment of Project F–518–4, part of proposed Freeway 518." *Id.* The entire F–518 project had been designed by Iowa to qualify for federal assistance. *Id.* Thus, at a *factual* level, *Indian Lookout Alliance* is not inconsistent with those decisions requiring at least actual application for federal highway funds before NEPA is triggered.

However, the court need not decide the interesting question of whether *Indian Lookout Alliance* can or must be harmonized with the decisions of other circuit courts of appeals. Furthermore, although the parties have argued whether NEPA has been triggered in this case, the court finds that it simply need not resolve that question. This is so, because the defendants have assumed that NEPA applied by preparing the 1989 EA and the 1993 supplemental EA. Unless those steps to comply with NEPA were inadequate, it makes no difference whether NEPA was in fact triggered, because only if those steps were inadequate would the defendants need to raise the defense that they were not required to go through those steps at all. Therefore, the court will proceed first to its review of the adequacy of the FONSI determination in this case, and will return to what might otherwise be the threshold jurisdictional question only if the court finds that the FONSI was inadequate.

### 2. Was the FONSI arbitrary and capricious?

#### a. The appropriate standard of review

■ In *Sierra Club*, the Eighth Circuit Court of Appeals stated the standard of review applicable to the question of whether an

agency's FONSI decision must be overturned:

As did the district court, we review the [agency's] FONSI decision under an arbitrary and capricious standard with a concern to determining whether the [agency] considered the relevant factors or made a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). We "must render an independent decision on the basis of the same administrative record as that before the district court; the identical standard of review is employed at both levels; and once appealed, the district court decision is accorded no particular deference." *Lockhart v. Kenops*, 927 F.2d 1028, 1032 (8th Cir.1991), *cert. denied*, 502 U.S. 863, 112 S.Ct. 186, 116 L.Ed.2d 148 (1991) (quoting *Brown v. United States Dep't of Interior*, 679 F.2d 747, 748–49 (8th Cir.1982)). *We must affirm if we find the [agency] took a "hard look" at the project, identified the relevant areas of environmental concern,*

*and made a convincing case for its FONSI. See Audubon Society v. Dailey*, 977 F.2d 428, 434 (8th Cir.1992).

*Sierra Club*, 46 F.3d at 838–39 (emphasis added). *See also Audubon Soc'y*, 977 F.2d at 433 (identifying these factors in the court's review, citing *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 681–82 (D.C.Cir. 1982), and *Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 127 (D.C.Cir.1985)). In *Audubon Society*, the court found that this "arbitrary and capricious" standard of review was prescribed by the Supreme Court in *Marsh*, 490 U.S. at 375, 109 S.Ct. at 1860. *Audubon Soc'y*, 977 F.2d at 433. In its turn, in *Marsh*, the Supreme Court derived this standard of review from section 10e of the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Marsh*, 490 U.S. at 375, 109 S.Ct. at 1860. Thus, if the court finds the EA adequate, "all [it] need consider is whether the [agency's] FONSI was arbitrary or capricious," not the kind of EIS the complainant is seeking. *Sierra Club*, 46 F.3d at 840.[31] Decisions of the Eighth Circuit Court

**31.** Judicial review of administrative decisions under NEPA is pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 706. *See, e.g., Marsh*, 490 U.S. at 375, 109 S.Ct. at 1859; *Volpe*, 401 U.S. at 419, 91 S.Ct. at 825. Applying the APA to judicial review under NEPA, courts generally follow the rule that, with few exceptions, judicial review of agency action is limited to the administrative record, excluding newly developed evidence. *See Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1511 n. 1 (9th Cir.1997); *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 527 (9th Cir.1997); *Environmental Coalition of Ojai v. Brown*, 72 F.3d 1411, 1414 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2500, 135 L.Ed.2d 192 (1996). Thus, the record upon which the court's review is based can be of critical importance. In this case, the court has grave concerns about the manner in which the record was prepared.

Courts have noted that "[t]he APA does not prescribe any procedure for assembling a 'record' for judicial review of informal rulemaking," *Mid–Tex Elec. Co-op., Inc. v. F.E.R.C.*, 773 F.2d 327, 343 (D.C.Cir.1985), quoting *Small Refiner Lead Phase–Down Task Force v. U.S.E.P.A.*, 705 F.2d 506, 519 (D.C.Cir.1983), and this court has not found that the APA or any regulations prescribe any procedure for assembling a record for judicial review of other agency decisions, either. However, the pertinent provision of the APA does provide that "[i]n making [its] determinations, the court shall review *the whole record* or those

parts of it cited by a party." 5 U.S.C. § 706 (emphasis added).

Voluminous as the "administrative record" presented to the court in this proceedings is, the court has little assurance that it has been presented with the "whole record." As the parties are well aware, the court was and continues to be greatly disturbed by the process used to compile the so-called "administrative record," as well as the process by which the so-called "record" was certified. After this litigation began, general counsel for the FHWA instructed the federal defendants to compile an administrative record of the documents that were supposedly relied upon to prepare the EA, its Addendum, and the FONSI. Michael Heitzman, an operations engineer for the Iowa Division of the Federal Highway Administration, testified that he had been "assigned" the duty of preparing the record. Heitzman explained that he and other transportation engineers gathered records from the Highway 71 project file and then proceeded to "separate out what [they] considered to be significant documents, pertinent to the case." Not only does this process preclude the court from reviewing the "whole record," but it also raises serious suspicion in this court's view as to whether the documents presented were actually the documents relied upon in the decision-making process.

After the court expressed its dissatisfaction with the compilation process, the defendants offered a three-volume supplement to the "administrative record." Rather than ameliorate the

of Appeals have not always applied this "arbitrary and capricious" standard to the agency's FONSI determination, however. In *Missouri Coalition for the Env't v. Corps of Eng'rs of the U.S. Army*, 866 F.2d 1025 (8th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989), the court had instead stated,

> The standard under which we review an agency's decision that preparation of an EIS is not required by NEPA is well settled. The initial burden of proof is upon the challenging party to demonstrate that there were facts omitted from the administrative record which, if true, would show that the permitted project could have a substantial impact on the environment. *Ringsred v. Duluth*, [828 F.2d 1305,] 1307 [ (8th Cir.1987) ]; *Olmsted Citizens for a Better Community [v. United States*, 793 F.2d 201,] 204 [ (8th Cir.1986) ]; *Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269, 271 (8th Cir.), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314 (8th Cir. 1974) (en banc). If such facts are established, and they are of sufficient significance to warrant shifting the burden of proof, *the agency must then demonstrate that its negative determination was reasonable under the circumstances. Id. The test is one of reasonableness—not whether the agency's determination was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Minnesota Public Interest Research Group, supra* at 1320.

*Missouri Coalition*, 866 F.2d at 1032 (emphasis added). Has the Eighth Circuit Court

of Appeals overruled *Missouri Coalition sub silentio*, or is there some other way to account for the application of a different standard in that case?

The decision in *Missouri Coalition*, this court finds, preceded the Supreme Court's decision in *Marsh*—the decision establishing the "arbitrary and capricious" standard of review—by approximately two months. That time frame provides at least the beginnings of an explanation for the difference. Nonetheless, in *Sierra Club*, the decision upon which this court relies for the appropriate standard of review, the Eighth Circuit Court of Appeals simply makes no mention of the differing standard in *Missouri Coalition*. *See Sierra Club*, 46 F.3d at 838–39. That is probably because the court had twice previously commented on the continued viability of *Missouri Coalition*.

In *Audubon Society*, the court discussed the factual review employed in *Missouri Coalition*, then commented, "We are not sure how much of *Missouri Coalition* has survived *Marsh*. See our discussion in *Goos [v. ICC]*, 911 F.2d [1283,] 1291–92 [ (8th Cir. 1990) ]." *Audubon Soc'y*, 977 F.2d 433–34. Thus, this court turns to *Goos* for guidance.

In *Goos*, the court's discussion of *Missouri Coalition*, particularly its continued viability in light of *Marsh*, was more extensive:

> *Marsh* establishes that when an agency determines not to prepare an EIS based on its review of the environmental impact of a project, as when it has already prepared an EA and issues a finding of no significant impact, a reviewing court reviews that determination under the arbi-

court's concerns, this action intensified them. Now it is even more apparent that the "whole record" was not contained in the original "administrative record." Further, neither the court nor the LRLDF have any knowledge as to the documents that have been omitted. No index was presented disclosing the documents not "selected" for inclusion in the administrative record. More importantly, the preparation of the "administrative record" was left to the subjective judgment of those individuals whose very decisions about the Highway 71 project are under attack here.

The certification process in this case is equally suspect. Heitzman testified that his superior, Robert L. Lee, certified the original record submitted to the court. Heitzman acknowledged

that Lee had no information regarding the process used to compile the record, let alone its contents. At best, Mr. Lee had no firsthand knowledge of the completeness of the record. At worst, he knew it was incomplete. Counsel for the FHWA attempted to assuage the court's concerns by indicating that she had reviewed the record with Mr. Lee, and that he had taken it home for review. This after the fact rationalization is woefully inadequate. Although counsel for the FHWA may be from a place where people simply trust each other, as she opined in chambers, the "rubber stamping" of the accuracy and completeness of the administrative record that occurred in this case creates a frightening potential for abuse. Isn't the fox guarding the henhouse here?

trary and capricious standard. *Our cases which have reviewed a similar question under the reasonableness standard are therefore incorrect.* For instance, in *Missouri Coalition,* the Corps of Engineers determined that an EIS was unnecessary after the Corps had prepared an EA and otherwise considered the environmental consequences of the project; no claim was made that NEPA was simply inapplicable. *Missouri Coalition,* 866 F.2d at 1032. Thus, *Missouri Coalition* is similar to *Marsh*—at issue is an agency's factual determination made under the assumption that NEPA applies—and *Marsh* provides the controlling standard of review for such a factual question.

*Goos,* 911 F.2d at 1292 (emphasis added). Nonetheless, the court in *Goos* held that the "reasonableness" standard continued to have some applicability, *Marsh* notwithstanding:

But *Marsh* does not control this case, for *Marsh* is factually distinguishable from some of our cases. That is, the Supreme Court in *Marsh* did not consider the threshold applicability of NEPA. Rather, the agency had assumed that NEPA applied and had already considered the environmental consequences of the proposed action. Hence, the question in *Marsh* involved a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh,* 490 U.S. at 374, 109 S.Ct. at 1860. In *Marsh,* the agency's determination not to prepare a supplemental EIS was based on its expert review of new factual information, such that "resolution of this dispute involves primarily issues of fact." *Id.*

In this case, however, we do not deal with a factual question made under the assumption that NEPA applies to a particular agency action. Rather, we deal with the threshold issue of NEPA applicability in the first instance. The I.C.C. in this case did not make a factual determination that it need not prepare an EIS as to the effects of a conversion under section 1247(d), after assuming the applicability of NEPA, after preparing an EA, and after determining that there was no significant impact. Rather, the I.C.C. did not prepare an EIS because it contends that NEPA simply does not apply to the conversion of rail use to trail use under section 1247(d). It argues that its issuance of [a Notice of Interim Trail Use (NITU) ] in a conversion proceeding is not a "major federal action" subject to NEPA. To this extent, we consider a different question than that presented in *Marsh.*

... *Accordingly, we are bound by these cases, and review the I.C.C.'s decision that NEPA does not require it to consider the environmental impact of a conversion under section 1247(d) for reasonableness in the circumstances.*

*Goos,* 911 F.2d at 1292 (emphasis added). Thus, the "reasonableness" standard continues to have some applicability. The question is, therefore, which standard is applicable here?

In this case, the defendants have indeed raised the "threshold" question of the applicability of NEPA. *Cf. Goos,* 911 F.2d at 1292. However, that assertion of the inapplicability of NEPA, the court finds, did not occur prior to or as the basis for any decision not to perform any requirements of NEPA. *Cf. id.* Instead, the defendants have raised the "threshold" argument only after the fact of an assumption that NEPA applies, the preparation of an EA—indeed, after the preparation of the 1989 EA and a supplemental EA in 1993—and a determination that the project in question has no significant impact. *Cf. id.* When the question of the applicability of NEPA has not been raised until all of the factual determinations NEPA requires have already been made, the court concludes that what it must review is the "factual question" that the project has no significant impact, for which *"Marsh* provides the controlling standard of review." *Cf. id.* Thus, the standard of review applicable here is whether the FONSI determination was arbitrary and capricious. *See id. See also Marsh,* 490 U.S. at 360, 109 S.Ct. at 1851; *Sierra Club,* 46 F.3d at 838–39; *Audubon Soc'y,* 977 F.2d at 433.

In *Audubon Society,* the Eighth Circuit Court of Appeals grappled with the question of precisely what is required under this "arbitrary and capricious" standard of review.

*See Audubon Soc'y,* 977 F.2d at 433. One party argued that the court "must look only to see whether the [agency] gathered information on the relevant subjects, not whether the [agency's] decision was consistent with the information so gathered." *Id.* The party asserting the inadequacy of the EA, however, argued that the court should "apply a de novo standard." *Id.* The Eighth Circuit Court of Appeals determined that courts are not limited to determining whether the agency had considered the "relevant factors." *Id.* at 434. Rather, the court concluded that it must also reverse if there has been a "clear error of judgment," which vests the court with the responsibility "to verify that the agency's conclusion follows from the premises the agency relies on." *Id.* The court will therefore review the agency's FONSI determination in this case with an eye for both the scope of its review of the facts and the quality of its judgment, but will overturn the agency's FONSI determination only if that determination was "arbitrary and capricious." *See Sierra Club,* 46 F.3d at 838–39 (considering whether "the [agency] took a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing case for its FONSI"); *Audubon Soc'y,* 977 F.2d at 434 (same).

### b. Application of the appropriate standard of review

The ultimate question the court must resolve regarding the LRLDF's NEPA challenge to the FONSI is whether the federal defendants' issuance of the FONSI was arbitrary and capricious.[32] To accomplish this task, the court must first assess the adequacy of the EA and its Addendum.

Although the LRLDF acknowledges that the 1989 EA discusses nine categories of local environmental impact,[33] and the 1993 supplemental EA discusses two more,[34] the LRLDF nonetheless contends that the complete EA was fatally deficient. The LRLDF contends that the EA was inadequate "in discussing the impacts in context by entirely omitting discussion of several local environmental impacts and discussing other environmental impacts with so little depth as to be no serious discussion, at all." Plaintiff's Brief In Support Of Motion For Preliminary Injunction at 11. The LRLDF identifies six categories of significant impact on the local environment that have been omitted or glossed over in the 1989 EA and its 1993 Addendum: (1) impacts caused by the loss of trees, which omitted discussion regarding the number of trees to be taken and the location of those trees; (2) impacts on wetland areas, which omitted discussion concerning the number of acres of wetlands affected by the project; (3) visual impacts, which omitted discussion of the visual impacts from paving dozens of acres of land currently occupied by green spaces, farm fields, a landmark lakeside restaurant, and an historic bridge; (4) socio-economic impacts, which omitted discussion of harm to businesses other than permanent displacement, the displacement of several residences, and the number of acres to be acquired as additional right-of-way; (5) water quality impacts, which omitted discussion of winter runoff of de-icing chemicals from dozens of acres of new pavement; and (6) public safety impacts, which omitted discussion of the bike path safety problem from siting the bike path within inches of highway traffic. The court will address each of these complaints in turn.

**32.** Daniel Mathis, Division Administrator for the FHWA, actually signed the FONSI. As the parties well know, the court was troubled to learn that although Mr. Mathis reviewed the EA, its Addendum, and the FONSI, he did not undertake any independent review of the administrative record prior to signing the FONSI. In this court's view, Mr. Mathis' actions were precariously close to being arbitrary and capricious. However, the court's focus here is not only upon Mr. Mathis, but also upon the agency—the FHWA.

**33.** The categories discussed in the 1989 EA are (1) water quality impacts; (2) natural areas and endangered species; (3) road side trees; (4) air quality impacts; (5) traffic noise impacts; (6) parks and recreation areas; (7) socio-economic impacts; (8) cultural resources; and (9) hazardous wastes.

**34.** The additional categories discussed in the 1993 supplemental EA are a changed alignment of the Maywood bypass and replacement of the historic Okoboji Bridge over the channel between East Lake Okoboji and West Lake Okoboji.

■ A review of the administrative record reveals that the defendants did indeed consider the impact the Highway 71 project will have on trees located in the Iowa Great Lakes Region. In a section entitled "Roadside Trees," the EA specifically states that "[t]he widening proposal would require the sacrifice of a number of roadside trees, either to accommodate the actual pavement widening or to allow for an adequate roadside clear zone in accordance with contemporary standards." EA at 46. The EA goes on to describe, albeit in general terms, the size and type of trees to be removed, and notes that none of the trees are considered to be local landmarks or protected species. Moreover, although the EA indicates that the loss of trees along the corridor would create an "aesthetic cost," it observes that this impact would not outweigh the safety and benefits anticipated from the project. The administrative record contains additional references to trees primarily in the context of agreements entered into between the Iowa DOT and the cities of Arnolds Park, Okoboji, and Spirit Lake to remove trees interfering with the project.

The EA does not specifically set forth the number of trees to be removed or their exact location. Nor is it required to do so. As the Eighth Circuit Court of Appeals has cogently observed, an EA is supposed to be both brief and concise, *see* 40 C.F.R. § 1508.9(a); however, "[a]n EA cannot be both concise and brief and provide detailed answers to every question." *Sierra Club*, 46 F.3d at 840 (concluding that a FONSI determination was not arbitrary and capricious, despite assertions that the EA's discussion concerning impacts of past timber sales and habitat fragmentation were insufficiently detailed). On this administrative record with particular focus on the contents of the EA, the court simply cannot conclude that the defendants failed to consider the impacts the project will have on trees situated in the Iowa Great Lakes Region. The defendants acknowledged that the project would in fact necessitate the removal of trees but that such action would not constitute a significant impact on the environment.

■ The EA also reflects that the defendants considered potential impacts upon the wetland areas of the Iowa Great Lakes Region. In a section entitled "Natural Areas and Endangered Species," the EA acknowledges that the Iowa Great Lakes area is part of the U.S. Prairie Pothole Region and as such, contains wetlands that are among "the nation's most important duck breeding habitat." EA at 45. The EA distinguishes between small wetlands and large wetland complexes, and indicates that "no large wetland complexes are encountered by the project." *Id.* It goes on to make the following observations:

> [O]nly one wetland lies adjacent to existing U.S. 71. It is classified as a semi-permanent wetland and is located on the west side of U.S. 71 between Okoboji and Spirit Lake. The current proposal would be to widen U.S. 71 to the east at this location to avoid intrusion into this wetland. Other smaller seasonal and temporary wetland-type areas which were identified near U.S. 71 on the National Wetland Inventory map would not be expected to be affected by the project.

EA at 45–46.

The administrative record contains additional information regarding wetlands in the Iowa Great lakes Region. For example, a thirty page document entitled "Protected Wetlands Inventory for all of Dickinson County" sets forth each wetland in the lakes region vicinity and describes it by owner, location, size and type. Other documents discuss mitigation plans for potentially impacted wetlands.

Neither the EA, its Addendum, or any other portion of the administrative record reflects the exact acreage and location of wetlands to actually be impacted by the present Highway 71 project proposal. The LRLDF takes great issue with this and with the fact that wetland delineation for the Highway 71 project did not commence until October 1997.

The administrative record does reflect that the EA was circulated for review and comment to the Department of the Army, Corps of Engineers (the "Corps"). The Corps responded to the EA by indicating that it

would need "detailed plans for each ... wetland crossing ... in order to determine which forms of authorization are required, if any." Jerry Shimek, a biologist with the Iowa DOT, testified that in October, 1997, he began the wetland delineation for the Highway 71 project area for the purpose of obtaining a § 404[35] permit from the Corps. Shimek explained that the § 404 application process is usually undertaken once a final project design is prepared, and therefore the process here did not begin until the project planning stage was at or very near completion. Although the delineation process had not been completed at the conclusion of trial, Shimek estimated that approximately 8.5 acres of wetlands are likely to be impacted by the Highway 71 project.

As with the trees to be impacted by the Highway 71 project, the court finds that defendants did take the requisite "hard look" at potential impacts to the wetlands implicated here. The LRLDF is absolutely correct in its assertion that the 8.5 acre figure has only recently come to light, nevertheless, this argument is unavailing. The administrative record demonstrates that the defendants acknowledged the existence of wetlands and the potential that they would be impacted by the project. The record further reflects that the defendants are well aware of the environmental significance of the wetland areas and the need to maximize mitigation efforts to protect them.

The fact that the Corps will need to evaluate and approve the § 404 applications and issue the necessary permits before any construction occurs in wetland areas convinces the court that impacts on wetlands will continue to command close scrutiny in the Highway 71 project. Unless the proposed improvements meet with Corps' approval, the defendants will be prevented from undertaking any action affecting these resources.

■ As for the LRLDF's complaint regarding the EA's treatment of socio-economic impacts, the court finds this argument unpersuasive. Extensive discussion in both the EA and its Addendum are devoted to the socio-economic impacts associated with not only the finished Highway 71 project, but also the impacts likely to be encountered during the construction phase. The EA sets forth mitigation proposals to alleviate the effect of forecasted socio-economic impacts. Moreover, the administrative record reveals that this area has commanded exceptional attention in this project. For example, the administrative record reflects consideration of socio-economic issues such as parking space, access to roadways during construction, agreements to limit construction activity to "non-tourist" seasons, arrangements to maintain an open roadway across the bridge at all times, and plans for relocation assistance.

■ Similarly, the court finds no basis on which to adjudge insufficient the EA's consideration of water quality impacts. In a section entitled "Water Quality Impacts," the EA acknowledges that impacts on water quality, particularly in both Okobji lakes, is of paramount importance. Extensive discussion regarding possible precautions to preserve water quality during the construction phase is set forth in this section. For example, the use of temporary settlement basins, silt curtains, and silt fences is suggested as a precautionary measure to reduce erosion and siltation into the lake. Other proposed measures include the use of a silt curtain throughout the causeway area, and the relocation of storm sewers and drainage outlets to reduce runoff from the construction areas.

■ With regard to the complaints concerning the EA's inadequate treatment of visual and public safety impacts (as they pertain to the bike path), the court also finds that these topics were considered in the EA, its Addendum, and supporting documents in the administrative record. The EA does not

---

**35.** As the Eighth Circuit Court of Appeals has explained, "[s]ection 404 of the Clean Water Act of 1977, 33 U.S.C. § 1344, forbids discharge of dredged or fill materials into 'navigable waters'—defined as 'waters of the United States'—unless authorized by the Army Corps of Engineers. Fresh water 'wetlands' are within this definition and thus are subject to the Corps' jurisdiction." *Missouri Coalition for the Env't,* 866 F.2d 1025, 1028 n. 2 (citing *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); 33 C.F.R. § 323.2(a) (1987) and 33 C.F.R. § 328.3(b) (1987)).

set forth extensive discussion of these topics, but the court has been unable to locate anything in the record suggesting that more extensive discussion is necessary.

In sum, the court concludes that although the LRLDF may well disagree with the findings and recommendations contained in the EA and its Addendum, such disagreements are insufficient to render the documents inadequate under the procedural requirements of NEPA. *See Robertson,* 490 U.S. at 350, 109 S.Ct. at 1845 (observing that NEPA itself does not mandate particular results).

■ Based on the EA and the Section 4(f) Statement, the federal defendants concluded that the Highway 71 project would have no significant impact on the environment. Having thoroughly reviewed the administrative record, as well as the EA and its Addendum, the court concludes that the defendants have in fact taken the requisite "hard look" at the Highway 71 project, have identified and discussed the relevant areas of environmental concern, and have made a convincing case for the FONSI. Given this conclusion, the court finds that the decision to issue the FONSI was not arbitrary and capricious.

### 3. Changed conditions and cumulative impacts

The LRLDF asserts that even if the court does not find the issuance of the 1993 FONSI to be arbitrary and capricious, changed conditions in the Highway 71 project mandate, at the very least, a supplemental EA to determine whether an EIS is now warranted. The LRLDF also asserts that the EA, its Addendum, and FONSI, fail to reflect the cumulative effects the project will have on the Iowa Great Lakes Region environment. Finally, the LRLDF asserts that the proposed Maywood Bypass in and of itself demands the preparation of an EIS. The court will address each of these complaints in turn.

### a. Impacts identified since the FONSI

■ NEPA's procedural requirements do not address the issue of post-decision supplementation. *See Marsh,* 490 U.S. at 370, 109 S.Ct. at 1860 (observing same). Never-

theless, supplementation is sometimes "necessary to satisfy [NEPA's] 'action-forcing' purpose." *Id.* at 371, 109 S.Ct. at 1857. Recently, the Court of Appeals for the Ninth Circuit considered the circumstances under which a supplemental EA must be prepared:

[A] supplemental EA is only necessary if an EA/FONSI is no longer valid. Thus, while the FHWA must take a "hard look" at the environmental impacts of project changes, whether a supplemental EA is required depends on the significance of the new impacts.

*Price Road Neighborhood Ass'n, Inc. v. United States Dep't of Transp.,* 113 F.3d 1505, 1510 (9th Cir.1997). The court reviews the agency's determination of "significance" under the arbitrary and capricious standard. *See Marsh,* 490 U.S. at 376, 109 S.Ct. at 1860 (concluding that the agency's determination not to supplement an EIS is controlled by the 'arbitrary and capricious' standard).

■ A formal "supplemental EA" has not been prepared in this case. However, the administrative record indicates that the defendants have continued to review the impacts associated with changed conditions in the Highway 71 project. Moreover, Michael Schweyen, environmental program coordinator for the FHWA, provided extensive explanatory testimony regarding the defendants' consideration of environmental impacts arising after the issuance of the 1993 FONSI. Schweyen identified a number of issues he described as "red environmental flags" raised after the FONSI. These "red environmental flags" include impacts upon historical sites, hazardous wastes, bike trail matters, displacement of buildings, businesses, and residences, and impacts affecting section 4(f) properties. Schweyen explained that these "red environmental flags" were not only considered by the defendants in their continuing review of the project, but that they were also discussed in a "project statement," that was published and made available to the public.

The court finds that the defendants have fulfilled their obligations under NEPA by continuing to review potential impacts resulting from the Highway 71 project. The defendants have addressed the "changed condi-

tions" identified by the LRLDF and have concluded that these conditions have not created effects that will result in a significant impact on the environment. The court does not find this conclusion to be arbitrary and capricious.

### b. Cumulative impacts

 As the court understands it, the essence of the LRLDF's cumulative impacts argument is that the defendants failed to consider the totality of the impacts caused by the Highway 71 project. In other words, even if the taking of twenty-seven acres of farmland, the removal of 380 trees in Arnolds Park and Okoboji, the use of 8.5 acres of wetlands, the addition of a four-lane bypass around Maywood, and the effects on water quality do not individually constitute a "significant impact on the environment," when considered together, they do.

 The court finds this cumulative impacts argument unpersuasive. " 'Cumulative impacts' are the collective environmental impacts of all 'past, present, and reasonably foreseeable future actions' taking place in the affected area." *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1181 (9th Cir.1990) (quoting *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1194 (9th Cir.1988) in turn (quoting 42 C.F.R. § 1508.7). As the court has discussed *infra*, the impacts cited by the LRLDF were adequately considered in the EA and its Addendum, as well as in the continuing review of impacts undertaken by the defendants. No evidence has been presented to indicate that future actions beyond the Highway 71 project are contemplated by the defendants for the Iowa Great Lakes Region. Further, the LRLDF has not argued that the defendants have failed to consider the impacts of any past actions on the Iowa Great Lakes Region environment. Under these circumstances, no further "cumulative impact" review is warranted.

### c. Maywood Bypass

 The LRLDF's final argument in support of its claim that an EIS must be prepared for the Highway 71 project revolves around the Maywood Bypass. The LRLDF asserts that the defendants have failed to adequately consider impacts on the environment anticipated by the construction of the bypass. Furthermore, the LRLDF asserts that because the Maywood Bypass contemplates a four-lane addition *outside the existing highway right-of-way*, the defendants are obligated, by their own regulations, to prepare an EIS.

A review of the Addendum as well as of supporting documentation in the administrative record convince the court that the defendants did in fact adequately consider impacts contemplated by the Maywood Bypass. The Addendum contains extensive discussion regarding the mechanics of the proposed Maywood Bypass [36] as well as the defendants' assessment of the impacts it would levy on the environment. The following observations regarding the Maywood Bypass are set forth:

An examination of project costs and anticipated right of way impacts, as compared to the original bypass concept, concludes the following: construction costs would be essentially the same. While the new alignment would be approximately 0.14 mile [sic] longer, it would also require less removal of old roadway and less reconstruction of sideroad tie-ins. An additional 3.5 acres of land would be required, two acres of which are considered farmland. The additional expense of this right of way, however, which would also include the purchase of a vacant commercial structure, would be offset by the savings realized from not having to purchase a house/acreage, nor relocate four individuals, as previously anticipated.

EA Addendum at 6–7.

The Addendum also recites the Maywood Bypass' anticipated impacts on water quality, natural areas and endangered species, air and noise, and parks and recreation facilities.

---

**36.** The bypass originally proposed in the EA met with substantial concern during a public information hearing. In response to this concern, "a revised alignment, located further east, was studied." EA Addendum at 1. This revised alignment was approved by the DOT Commission on September 5, 1990.

It further identifies socio-economic impacts, cultural resource impacts, and hazardous waste impacts. As to all of these impacts, the Addendum concludes that the Maywood Bypass would not have a significant impact on the environment warranting the preparation of an EIS.

The LRLDF has not identified any impact the defendants failed to consider in regard to the bypass. Instead, it invites the court to make the finding that the assessment of the impacts considered is inadequate. The court must decline the invitation. The defendants solicited comments on the original bypass proposal and responded to them by developing a revised bypass alternative. They evaluated the impacts presented by the proposed action and reached the conclusion that these impacts would not have a significant impact on the Iowa Great Lakes Region environment. The court's review of the EA, the Addendum, and the administrative record compels it to conclude that the defendants have not behaved in an arbitrary and capricious manner in issuing the FONSI based on this information.

■ The LRLDF's second argument in support of the need for an EIS stems from a NEPA-implementing regulation. Title 23, section 771.115 of the Code of Federal Regulations, provides, in pertinent part that:

> (a) *Class I (EISs).* Actions that significantly affect the environment require an EIS (40 C.F.R. 1508.27). The following are examples of actions that normally required an EIS:
>
> * * * * * *
>
> (2) A highway project of four or more lanes on a new location.

23 C.F.R. § 771.115 (1997). The parties do not dispute that the Maywood Bypass is indeed a "highway project of four or more lanes on a new location." The defendants deny, however, any obligation to prepare an EIS on the grounds that although the regulation *normally* requires an EIS for projects such as the Maywood Bypass, an EIS is not necessary here because the Maywood Bypass does not present any significant impact to the human environment.

A close reading of the regulation supports the defendants' position. Although a four-lane project on a new location may by its very nature impose a significant impact on the environment, apparently there are occasions where this is not the case. The plain language of the regulation contemplates as much by its inclusion of the word "normally." Insofar as the court has found the Addendum and FONSI regarding the Maywood Bypass adequate under the procedural requirements of NEPA, this appears to be an occasion where an EIS is not warranted.

What is troubling to the court here is not the substance of the defendants' position but rather the almost cavalier attitude displayed by the FHWA in response to this attack, When questioned about the practice in Iowa regarding the preparation of an EIS for a four-lane project on a new location, Daniel Mathis testified that "ninety-five percent of the time" an EIS is not prepared. The court inquired as to the seeming inconsistency of this practice and the wording of the regulation. Mr. Mathis conceded that "[i]t sounds inconsistent ... but we've received guidance from our headquarters office and our regional office that environmental impact statements do not necessarily have to be prepared for four-lane facilities on new alignment or new location."

The court and the LRLDF certainly have the right to look askance at the FHWA's explanation in light of the FHWA's own regulation which appears to offer contrary guidance. Nevertheless, what is necessary in other highway projects of "four or more lanes on a new location" is not dispositive here. In this case, the defendants have taken the requisite "hard look" at the impacts anticipated from the Maywood Bypass and have determined that these impacts do not rise to the level of a significant impact on the environment. The court's role is limited to ascertaining whether this determination is supported by the administrative record. The court concludes that it is.

### 4. Public involvement

■ The LRLDF emphasizes that despite its belief that the Highway 71 project will have a significant impact on the environ-

ment, it does not seek a "guaranteed outcome regarding aspects of the highway plan." Plaintiff's Post–Trial Brief at 9. Rather, the LRLDF argues, it seeks an EIS to ensure that "members of the public who will be impacted by [the project]" will be provided with "full information" so that their views can be added to the planning process. *Id.*

The defendants insist that they have taken extraordinary steps to facilitate public involvement in this project. Michael Schweyen testified that in addition to public hearings regarding the project design, the Iowa DOT implemented "partnering groups." The partnering groups were composed of citizens of the Iowa Great Lakes Region communities and members of the Iowa DOT. The partnering groups were broken down into various "sub-groups" to address specific different areas of community concern. The groups met to "discuss the status of the project, to discuss proposed changes with the project, and to solicit public input." As Schweyen described it, the purpose of the partnering program was to "get a design that was satisfying to the community and helped to bring the community together."

The LRLDF is not impressed with the partnering program. Far from creating an "informed public," the LRLDF contends the partnering program did not address the pertinent environmental issues created by the Highway 71 project. According to the LRLDF, the " 'partners' were simply allowed to 'arrange the deck chairs on the Titanic.' " Plaintiff's Post–Trial Brief at 10.

There can be no doubt that this project has been riddled by controversy since its conception. Although the court is not entirely convinced that the partnering program has achieved the lofty goals espoused by Mr. Schweyen, the court is satisfied that the defendants have adhered to NEPA's public information requirements. As discussed *supra*, NEPA requires federal agencies to be fully informed before taking any action that may affect the environment. *See, e.g., Sierra Club*, 46 F.3d at 837. NEPA also requires that interested groups have access to this information. *Id.* The administrative record reflects that public hearings have been held throughout the planning stages of this pro-

ject, and that the partnering process has elicited public comment. Under these circumstances, the court simply does not find the defendants' actions to be in violation of NEPA's public information requirements.

### B. Section 4(f) Claims

The LRLDF contends that the decisions to destroy the Okoboji bridge and The Wharf restaurant building, as well as the decision to take land from Claire Wilson Park violate section 4(f) of the Department of Transportation Act because leaving the existing two-lane highway through and across the causeway area is a feasible and prudent alternative to widening this portion of U.S. 71. The court will commence its analysis of the LRLDF's section 4(f) claims by considering the appropriate standard of review and by examining the three-prong test applicable to section 4(f) claims.

### 1. Standard of review

When a party challenges the adequacy of a Section 4(f) Statement, that party bears the burden of proof "to show by a preponderance of the evidence that the Secretary acted improperly in approving the use of protected property." *Ringsred*, 828 F.2d at 1302 (citing *Louisiana Envtl. Soc'y, Inc. v. Dole*, 707 F.2d 116, 119 (5th Cir.1983)). The district court must "review[ ] the Secretary's decision based on the whole administrative record" to determine whether the Secretary's decision was arbitrary, capricious, or an abuse of discretion. *Id.* at 1302 & 1303–04 (finding that the district court had "carefully reviewed the whole record that was before the agencies at the time the decision was made," citing 5 U.S.C. § 706, and had not clearly erred in concluding that "the Secretary properly understood the scope of her authority and that her decision was not arbitrary, capricious, or an abuse of discretion"). *Accord Alaska Ctr. for the Env't*, 123 F.3d at 1300 ("We may set aside [the agency decision that there is no prudent alternative] only if the decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' " also citing 5 U.S.C. § 706(2)(A)); *Sierra Club*, 120 F.3d at 634 ("This court has held that in reviewing § 4(f) decisions, a

court should affirm a decision if it concludes ' "that the Secretary could have reasonably believed that in [the] case there are no feasible alternatives or that alternatives do involve unique problems." ' *Communities, Inc. [v. Busey]*, 956 F.2d [619], 624 [ (6th Cir. 1992) ] (citation omitted). It is, further, the responsibility of the plaintiffs to propose cognizable alternatives that would not use § 4(f) resources. *See id.* at 625."); *Laguna Greenbelt, Inc.*, 42 F.3d at 533 ("We have reviewed the FHA's section 4(f) analysis to determine whether the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

### 2. The Overton Park inquiry

■ In reviewing the record, "the reviewing court [is] to accord the Secretary's decision a 'presumption of regularity,' but nonetheless to engage in a 'thorough, probing, in depth review.' " *Ringsred*, 828 F.2d at 1302 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). The Eighth Circuit Court of Appeals has applied to this inquiry the three-part analysis postulated in *Citizens to Preserve Overton Park:*

The first question in the *Overton Park* analysis is whether the Secretary acted within the scope of her authority. *[Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823]. In making this inquiry, the reviewing court must consider "whether the Secretary properly construed [her] authority to approve the use of parkland as limited to situations where there

are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems," *id.* at 416, 91 S.Ct. at 823, and whether the Secretary could have reasonably believed that no such alternatives existed. *Id.* The second question is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Id.* The third and final question is whether the necessary procedural requirements were met. *Id.* at 417, 91 S.Ct. at 824.

*Ringsred*, 828 F.2d at 1302. *Accord Committee to Preserve Boomer Lake Park v. Department of Transp.*, 4 F.3d 1543, 1549 (10th Cir.1993) ("*Overton Park* instructed reviewing courts to conduct a three-tiered inquiry of the Secretary of Transportation's decision to fund a highway across land covered by § 4(f).").[37]

### 3. Application of the Overton Park inquiry

■ As to the first prong of this analysis, the focus is the evaluation of alternative routes:

"An alternative route that also impacts upon parks and historic sites is not an 'alternative to the use' of such property" within the meaning of section 4(f). The term "use" is to be broadly construed, and should include any alternative that impairs the utility of the 4(f) property. The harmful effects of increased noise levels, air pollution, decreased accessibility, and neg-

---

**37.** The statement of the three prongs of the *Overton Park* analysis by the Tenth Circuit Court of Appeals is comparable to that of the Eighth Circuit Court of Appeals:

First, the reviewing court is "required to decide whether the Secretary acted within the scope of his authority" under § 4(f). *[Citizens to Preserve Overton Park*, 401 U.S.] at 415, 91 S.Ct. at 823. In this initial inquiry, we "must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." *Id.* at 416, 91 S.Ct. at 823. Second, the court must decide whether the Secretary's ultimate decision was " 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." ' *Id.* (quoting 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V)). This inquiry involves determining

"whether the [Secretary's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Finally, the Supreme Court instructs reviewing courts to determine "whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. at 824. In reviewing the district court's conclusion to uphold the agency's decision, we apply the above inquiry without deference to the district court. *Arizona Past & Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1425–26 (9th Cir.1983). Our review must be probing and thorough, but "the Secretary's decision is entitled to a presumption of regularity." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. *Committee to Preserve Boomer Lake Park*, 4 F.3d at 1549.

ative visual impact of [a project] constitutes a use of the park as much as does a territorial encroachment.

*Ringsred,* 828 F.2d at 1303 (citations omitted). Thus, in light of the congressional purpose of section 4(f)—to make protection of parkland of prime importance in considering where to build federal roads and highways—"the Secretary d[oes] not violate the statute by excluding from consideration an alternative that had an equal or greater negative impact on the aesthetic value of the land." *Id. Accord Laguna Greenbelt, Inc.,* 42 F.3d at 533 ("Section 4(f) applies to constructive use as well as actual use of parkland. *Sierra Club v. Department of Transp.,* 948 F.2d 568, 573 (9th Cir.1991). '[C]onstructive use of park land occurs when a road significantly and adversely affects park land even though the road does not physically use the park.' *Id.*"); *City of Grapevine, Tex. v. Department of Transp.,* 17 F.3d 1502, 1507 (D.C.Cir.) *cert. denied,* 513 U.S. 1043, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994) ("For the purpose of § 4(f), noise that is inconsistent with a parcel of land's continuing to serve its recreational, refuge, or historical purpose is a 'use' of that land.").

 The method used for analyzing alternatives must have "a rational, consistently applied basis that enabled the Secretary to take into account the relevant considerations." *Id.* at 1304. There is no "feasible alternative" within the meaning of § 4(f) if " 'as a matter of sound engineering it would not be feasible to build the highway along any other route.' " *Committee to Preserve Boomer Lake Park,* 4 F.3d at 1549 (quoting *Citizens to Preserve Overton Park,* 401 U.S. at 411, 91 S.Ct. at 814). Although "prudent" generally involves "a common sense balancing of practical concerns," section 4(f) "requires the problems encountered by proposed alternatives to be 'truly unusual' or 'reach[ ] extraordinary magnitudes' if parkland is taken." *Id.* at 1550.

 The plaintiffs here rely on the requirement that the agency must identify "unique problems or truly unusual factors" relating to rejected alternatives, citing *Stop H-3 Ass'n v. Dole,* 740 F.2d 1442 (9th Cir. 1984) *cert. denied,* 471 U.S. 1108, 105 S.Ct.

2344, 85 L.Ed.2d 859 (1985). In *Citizens to Preserve Overton Park,* the Supreme Court also observed,

Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.

*Citizens to Preserve Overton Park,* 401 U.S. at 412, 91 S.Ct. at 821. However, as the Ninth Circuit Court of Appeals has explained,

In *Stop H-3,* we assumed the rejected alternatives met the stated purpose of the project. Consistent with *Overton Park,* we concluded that, if a rejected alternative would satisfy the purpose of the project without using land covered by section 4(f), an agency cannot reject those alternatives based on increased costs or community disruption unless the costs and disruption are of "extraordinary magnitudes." *Stop H-3,* 740 F.2d at 1449-55.

In the present case, the FHWA rejected the rail system alternative because it did not satisfy the purpose of the project—to meet the demand for access to Whittier. ACE does not contend that the FHWA defined the purpose of the project so narrowly as to disqualify all alternatives except the road alternatives. In these circumstances, the FHWA is not required to make a further showing of "unique problems" or "truly unusual factors" associated with the rail alternative. *Arizona Past and Future [Found., Inc. v. Lewis],* 722 F.2d [1423,] 1428 [ (9th Cir.1983) ]. The FHWA did not act arbitrarily, capriciously, or abuse its discretion by rejecting an alternative which would not satisfy the purpose of the project. *See id.* at 1428-29.

*Alaska Ctr. for the Env't,* 123 F.3d at 1301. Thus, unless the alternatives asserted by the plaintiffs satisfy the purposes of the project, the agency will not have to demonstrate "unique problems" or "truly unusual factors" associated with rejected alternatives. As another circuit court of appeals has explained, "The inability of an alternative to accommodate future traffic volume is justification for rejecting that alternative." *Committee to Preserve Boomer Lake Park,* 4 F.3d at 1550. The same court observed, "Similarly, if an alternative does not satisfactorily fulfill the purposes of the project, which in this case included providing an east-west transportation route through town, then the alternative may be rejected" and "[s]afety and cost concerns are also valid considerations in rejecting an alternative." *Id.* Even if none of these factors alone was sufficient to justify rejecting an alternative, "their cumulative weight [may be] sufficient to support the Secretary's decision." *Id.*

### a. *Claire Wilson Park*

■ There is no dispute that Claire Wilson Park is a parkland entitled to the protections of section 4(f). The LRLDF has proffered a "preferred alternative" to the construction of a three-lane highway through the causeway area—an alternative that the defendants have rejected as infeasible and imprudent. As an initial matter, the court must determine whether the LRLDF's "preferred alternative" satisfies the purposes of the Highway 71 project. *See Alaska Ctr. for the Env't,* 123 F.3d at 1301.

As indicated in the Final 4(f) Statement, replacement of the historic Okoboji bridge and the attendant construction to widen the existing highway to a three-lane facility through the causeway area necessitate the acquisition of approximately 0.08 acres of gravel parking lot space from Claire Wilson Park. "No facilities to accommodate park users, such as benches, tables, trash receptacles, etc. ..." are to be displaced by the acquisition.

The LRLDF contends that its "preferred alternative" to retain, update, and improve the existing two-lane highway through the causeway constitutes a feasible and prudent alternative to the 0.08 acre acquisition. Although the defendants agree that retention of the two-lane highway would effectively eliminate any impact to the park, they emphasize that this alternative was rejected because it would not meet the stated goals of the Highway 71 project.

The administrative record indicates the purpose of the Highway 71 project through the Iowa Great Lakes Region is to achieve the following goals:

> The primary need for this project is to replace the existing 59–year–old pavement and 60–year–old causeway bridge structure, thereby improving the level of service and providing a safer roadway along the existing highway corridor. The existing facility is structurally deficient and functionally obsolete to serve U.S. 71 traffic and, specifically, the high volumes of traffic that are generated during the summer tourist season.

The defendants assert that retention of the two-lane highway across the causeway is not a feasible and prudent alternative in light of the Highway 71 project's stated goals of increased highway safety and improved motorist accessibility.

The defendants determined that implementing the two-lane alternative through the causeway, while widening the remainder of the six mile U.S. 71 route, would result in a "lack of multi-lane route continuity through the area" as well as "two additional conflict points ... where the differing width pavement sections merge." Environmental Assessment and Preliminary Section 4(f) Statement at 111. The defendants concluded that traffic congestion and safety problems would "undoubtedly be encountered at those points."

The administrative record supports the defendants' conclusion. One of the reports relied upon by the defendants sets forth a study of the sufficiency ratings of existing U.S. 71 along the proposed improvement route. The study indicates that ninety-nine percent of the study area is rated as "poor," reflecting structural inadequacies in the existing pavement as well as deficiencies in safety features. According to the study, the "poor" score also reflects a low level of effi-

ciency in regard to "accommodating specific volumes of traffic with a minimum of conflict." Another report sets forth an accident study surveying traffic accidents through the project area from 1985 to 1987. The accident study reveals that during the three-year study period, sixty-one percent of the municipal accident total occurred in the 1.4 mile section of U.S. 71 between Lake Street in Arnolds Park and Sanborn Avenue in Okoboji. This 1.4 mile section includes the causeway/claire Wilson Park area. Accidents were particularly prevalent during the "peak" summer tourist months.

■ To further demonstrate problems associated with traffic congestion through the causeway area, the defendants offered the testimony of Steven Dulin, Chief of Arnolds Park Fire and Rescue. Dulin opined that traffic congestion in the causeway has resulted in difficulty moving emergency vehicles through the area, particularly during the summer tourist season.[38]

The court finds that the defendants thoroughly considered the two-lane alternative advocated by the LRLDF and reasonably determined that it was not a feasible and prudent alternative in light of the purposes of the Highway 71 project. *See Arizona Past and Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1428 (9th Cir.1983) (observing that "[a]lternatives that do not accomplish the purposes of the project may properly be rejected as imprudent."). To the extent that the LRLDF argues that its proposed two-lane alternative differs from the two-lane alternative considered and rejected by the defendants, the court finds that argument to be without merit. The administrative record, specifically the EA and accompanying traffic surveys, indicate that a continuous two-lane highway through the Highway 71 Corridor is inadequate to meet the project's stated goals. Therefore, the court finds that the defen-

dants have not only considered the two-lane alternative proposed by the LRLDF, but also an additional two-lane alternative specifically geared to the Claire–Wilson Park area. Both of these alternatives have been rejected. Although the LRLDF vehemently urges the court to adopt its belief that the retention of the two-lane highway is a feasible and prudent alternative, the court simply may not substitute its judgment for that of the defendants. *See Ringsred*, 828 F.2d at 1304.

The LRLDF has proposed no other alternative consistent with the stated purposes of the Highway 71 project and accordingly, contrary to the LRLDF's assertion, the defendants need not demonstrate "unique problems" or "truly unusual factors" associated with rejected alternatives[39]. *See Alaska Ctr. for the Env't*, 123 F.3d at 1301. Having resolved the LRLDF's challenge to the Claire Wilson Park property on the first prong of the *Overton Park* analysis, the court need not consider the defendants' decision in light of the remaining two prongs.

#### b. The Okoboji bridge

■ As with Claire–Wilson Park, the parties do not dispute that the Okoboji bridge is an historic site entitled to the protections of section 4(f). The LRLDF advances a virtually identical argument with regard to this property, asserting that the retention and improvement of the bridge is a feasible and prudent alternative to its destruction.

According to the EA and its Addendum, the defendants considered three alternatives, described in section I *supra*, to destroying the bridge. Each of these alternatives would have ameliorated or eliminated impact to the bridge and therefore the court will address all three[40].

The LRLDF asserts that with regard to the bridge, the defendants did not even con-

---

**38.** As the LRLDF points out, this information is not contained in the administrative record. Nevertheless, the court finds that it may properly consider this information as explanatory testimony regarding traffic congestion problems through the causeway.

**39.** The Final 4(f) Statement reveals that the defendants did indeed consider and reject other

alternatives such as filling the causeway or constructing a bridge in a different location.

**40.** The LRLDF has not indicated which rejected alternative it takes issue with. Instead, it simply asserts that the retention of the two-lane highway through the causeway area is a feasible and prudent alternative to destroying the bridge.

sider a two-lane alternative. The court disagrees. The first alternative, described as the "Do–Nothing" alternative, contemplates retention of the existing two-lane highway. This alternative was rejected by the defendants for the same reasons they rejected the two-lane alternative to taking land from Claire Wilson Park. The court's determination that the administrative record supports the defendants' conclusion that retention of the existing two-lane highway through the causeway would not meet the goals and purposes of the project applies equally to the defendants' rejection of the "Do–Nothing" alternative here.

Another two-lane alternative considered by the defendants, "Rehabilitation Without Affecting the Historic Integrity of the Bridge," was also rejected. This alternative appears to be the alternative advocated for by the LRLDF because it envisions retaining the two-lane roadway while implementing updated safety features and other improvements. The administrative record reflects that although it would be feasible to rehabilitate the historic bridge from an engineering standpoint, such rehabilitation would necessarily compromise the "historic integrity" of the bridge. For example, current safety regulations would require alterations that would dramatically alter the appearance and distinctive nature of the bridge. Moreover, any effort to widen the existing bridge would jeopardize its historic structural features. Common sense dictates that an alternative such as this that would destroy the historic significance of the structure at issue is not really an alternative at all within the meaning of section 4(f).

█ Finally, the defendants rejected the alternative to "Build on New Location Without Using the Old Bridge." The defendants concluded that because the historic Okoboji bridge is located atop a narrow isthmus of land separating the West and East Okoboji Lakes, it occupies the only feasible and prudent site for a bridge crossing. The administrative record supports this conclusion. The EA Addendum indicates that the construction of a new bridge in a different location would entail "extraordinary bridge and approach engineering, construction difficulties, significant environmental concerns, and higher costs."

In considering the "Build on a New Location" alternative, the defendants also explored the feasibility of widening the historic bridge. The defendants determined that it was neither feasible nor prudent to widen the bridge into West Lake Okoboji primarily because to do so would jeopardize the lake's water quality.[41] In addition to this environmental objection, widening into West Lake Okoboji would also involve displacing several mobile homes and would impact a number of businesses as well as a city-owned beach. Similarly, the defendants rejected the alternative of widening the bridge into East Lake Okoboji. This alternative was considered by the defendants to be infeasible and imprudent because it would necessitate 1.25 acre encroachment upon Claire Wilson Park as well as the displacement of several businesses.

In reviewing the decision to destroy the Okoboji bridge, the court is again mindful that it must not substitute its judgment for the judgment of the defendants. *See Ringsred*, 828 F.2d at 1304. The administrative record reflects that the defendants considered several alternatives to destroying the bridge, and concluded that the alternatives either failed to meet the stated goals of the project, impacted other 4(f) property, threatened increased environmental impact, or were simply infeasible and imprudent due to the logistics of the causeway area. These justifications are proper grounds for rejecting alternatives in a section 4(f) analysis. *See Geer v. Federal Highway Admin.*, 975 F.Supp. 47, 75 (D.Mass.1997) (observing that the agency may consider a number of factors in assessing alternatives, such as inability to accommodate future traffic volume, inability to satisfactorily accomplish project goals, excessive cost, aesthetics, and construction impacts or safety concerns). Under these circumstances, the court is com-

41. Although any degradation of water quality merits great concern, the water quality of West Lake Okoboji is of particular importance because of that lake's designation as Iowa's only "blue water lake."

pelled to conclude that the defendants have fulfilled their obligations under section 4(f) for intruding upon a protected historic site.

One final note. The court is certainly mindful of the Okoboji bridge's significance as one of the few remaining concrete cantilever structures in Iowa. It appears to the court that the defendants have taken great care to *minimize* the harm to the destruction of the Okoboji bridge in their mitigation plan. The *administrative* record indicates that the HAER documentation discussed *infra*, has been accepted by the Division of National Preservation Programs and transmitted to the Library of Congress for permanent storage.

#### c. The Wharf restaurant

▮ Prior to the submission of its post-trial brief, the LRLDF contended that the decision to destroy The Wharf restaurant building also constituted a section 4(f) violation because the property constituted an historic site, protected by section 4(f). It now appears that the LRLDF has abandoned this argument insofar as it has made no mention of a 4(f) violation regarding The Wharf property in its post-trial brief.

In any event, the court finds that the protections of section 4(f) are not implicated by the proposed destruction of The Wharf property. Project Architectural Historian, Marlin Ingalls, concluded that this property did not meet the criteria necessary to establish eligibility for the National Register of Historic Places. Ingalls' report, set forth in its entirety in the administrative record, further reveals his assessment that the building's "original Arts–and–Crafts styling has been removed during recent alterations so its present appearance is of a modern store front with little character."

The LRLDF and the defendants disagree as to the historic significance of The Wharf and surrounding area. At the TRO hearing, the LRLDF offered the testimony of James Hippen, an historian, who opined that The

Wharf restaurant, along with the Okoboji bridge, the northern tip of the causeway, the former railroad bridge, the pedestrian tunnel, and the Kentucky Fried Chicken comprised a potential historic district.[42] Ingalls contradicted this testimony, opining that the area did not constitute a potential historic district because "that entire area had undergone such seemingly intensive modifications that although the bridge seemed to be intact and eligible, that the rest of it had undergone too many modifications."

▮ The defendants' decision that The Wharf restaurant building was not entitled to the protections of section 4(f) was not arbitrary and capricious. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861.

Although the court is well aware of the nostalgic value The Wharf restaurant may have to the Iowa Great Lakes Region, such value does not rise to the level necessary to qualify The Wharf as an historic site. Absent a finding of eligibility for the National Register of Historic Places, The Wharf is not sheltered by section 4(f). *See Arizona Past & Future Found., Inc.*, 722 F.2d at 1429 (observing that to invoke the protections of section 4(f), an historic site must meet the criteria of eligibility for inclusion on the National Register).

### III. CONCLUSION

This court is mindful of the admonition issued by the United States Supreme Court in *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460, that the purpose of NEPA "is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision-making unit of the

---

**42.** Hippen defined an "historic district" as a "collection of structures or buildings that together are important. Any given structure may or may not be National Register eligible, but taken together because of their history, integrity, and

functional continuity, they have a historical meaning that transcends any given one structure within that." Temporary Restraining Order (excerpted transcript) at 10.

agency." *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 558, 98 S.Ct. at 1219. In other words, this court may not set aside the defendants' decision merely because it is unhappy with it—which it is. The court shares the LRLDF's fear that the Highway 71 project may have a dramatic, negative impact on the "Okoboji lifestyle and experience"—the very things that make visiting or living there unique. However, the federal statutory framework for judicial review in this case does not provide for consideration of such fears. Future events may vindicate the LRLDF's belief that the defendants' determinations were unwise, if not wrong. *See Citizens Against Burlington*, 938 F.2d at 199 (citing *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 557–58, 98 S.Ct. at 1219). For today, however, the court is constrained only to ensuring that the defendants fulfilled their obligations under the relevant statutes. *See id.*

The court finds that the EA and its Addendum adequately considered (individually and cumulatively) the environmental impacts anticipated by the Highway 71 project. Given this finding, the court concludes that the defendants' issuance of a FONSI, and thus their decision not to prepare a comprehensive EIS, was not arbitrary and capricious. The court also finds that the defendants have fulfilled their obligations under NEPA by continuing to review impacts stemming from "changed conditions."

The court further finds that the Final 4(f) Statement adequately addresses the impacts on protected parkland and historic sites implicated by the Highway 71 project. In accordance with the relevant statutory provisions, the defendants have set forth their determination that alternatives to the use of these protected areas will not accomplish the stated goals of the Highway 71 project. Further, the defendants have taken the requisite action to minimize the harm caused by the acquisitions.

One final point. Although it did not prevail in this action, there can be little doubt that the LRLDF stood on the courage of its convictions and argued the case with fortitude and tenacity. The court recognizes that, all too often, citizen groups like the LRLDF stand as the only buffer between the power of government and the individual citizen when it comes to environmental matters. The failure of the LRLDF's claims here was not owing to any lack of initiative or skillful advocacy by counsel. Rather, it is the result of the constraints imposed by federal legislation.

THEREFORE, the LRLDF's request for permanent injunctive relief is **denied,** and the **restraining order** presently in effect is **dissolved. Judgment is entered for the defendants.**

IT IS SO ORDERED.